J. C. WATSON, Jr., Appellant,

v.

The STATE of Texas, Appellee.

No. 62864.

Court of Criminal Appeals of Texas,
Panel No. 2.

Feb. 27, 1980.

Rehearing Denied April 23, 1980.

George Scharmen (Court-appointed), David K. Chapman (Court-appointed), San Antonio, for appellant.

Bill M. White, Dist. Atty., Raymond C. Angelini, Raymond DeLeon, Sharon Mac-Rae and Monica L. Donahue, Asst. Dist. Atty., San Antonio, Robert Huttash, State's Atty., Austin, for the State.

Before DOUGLAS, ROBERTS and CLINTON, JJ.

## OPINION

CLINTON, Judge.

This is an appeal from a conviction for the offense of murder. Appellant, having been tried as an habitual offender under the ambit of V.T.C.A. Penal Code, § 12.-42(d), was sentenced to confinement for life in the Texas Department of Corrections.

Though appellant presents some eleven grounds of error for our consideration, we need not reach each of these contentions. In his second ground of error, the contention is advanced that the trial court erred in permitting, over timely objection, an incompetent witness to testify. Further, as appellant contends in his third ground of error, the error was compounded by the trial court's appointment of an interpreter who was unqualified to "translate" the witness's testimony and who was something less than neutral and detached vis a vis the outcome of the proceedings. We agree and now reverse the judgment below.

The State's case consisted primarily of the testimony of one Jerry Lewayne Thomas, an accomplice to the offense, which was ostensibly corroborated by the testimony of George Keilmann, Sr., husband of the deceased. The elder Keilmann had been incapacitated by a stroke which left him unable to speak save for the expression "uh-huh."[1] Keilmann was unable to write; though he retained the ability to *hear*, his capacity to *understand* questions asked of him was shown to be impaired.

Outside of the presence of the jury, Keilmann was examined by the respective parties and the trial court to determine if in fact he was competent to testify. The witness was first asked a series of routine leading questions to which he responded with the same answer, "uh-huh," to questions calling for an affirmative answer. However the witness displayed some difficulty in attempting to communicate a negative response, responding with the same "uh-huh" when asked by the trial court how he communicated such a negative response.

As the examination progressed, the witness failed to respond, either audibly or at all, to a series of questions propounded by the prosecutor. The witness was asked if he had been driving the family pickup truck on the day of the offense, to which he responded "uh-huh." However, the son of the witness, George Keilmann, Jr., definitely feeling that his father had answered the question in the affirmative, advised the court that his father had *not* been driving the vehicle on that day.

As the witness continued to have difficulty in responding to the prosecutor's leading questions, the following exchange occurred:

DEFENSE COUNSEL: I think the issue here is whether or not this gentleman can *understand* the questions as well as to *answer* [sic] the questions.[2]

THE COURT: That is true. That is true.

DEFENSE COUNSEL: So far there hasn't—

THE COURT: He can obviously hear the questions and he can obviously make a response to what he hears. *The problem is do we understand the response and is our understanding adequate enough that he can testify.* That is the only problem that is involved in the case.

At this juncture, the brother-in-law of the witness volunteered the fact that the

---

1. At one juncture, however, the witness uttered the only intelligible words he would speak at trial "No. Goddamn it."

2. All emphasis is supplied throughout by the writer of this opinion unless otherwise indicated.

witness would be able to respond to "yes" or "no" questions with the aid of two cards labelled "yes" and "no." However this system of interrogation ran aground quickly when the witness pointed to the "yes" card while shaking his head to seemingly indicate "no," as well as indicating in the affirmative that his name was *Steve* Keilmann. As the prosecutor observed that "I don't think he [the witness] understands," the trial court noted:

"But the problem is, in my opinion, at this point *there is a serious question as to whether he can testify about this . . .* [I] want to be sure whatever witnesses there are to that, it is clear that *those witnesses understand what they are testifying to.*"

Sometime later, Keilmann, Sr., again was examined outside the hearing of the jury, accompanied at this time by a woman who "had been taking care" of him for some six months. In attempting to explain to the trial court how in fact she was able to distinguish Keilmann's "yes" answers from his "no" answers, the witness recounted:

"Well, his yes answers [sic] he puts quite a bit of emphasis on his yes answers and he will bow to you usually. And if he is saying no he usually grabs you. That means to halt, and then he will explain whatever he is trying to tell you over."

The woman did admit, however, that the two really did not talk as such but could "communicate."

Still outside the presence of the jury, and with his "interpreter" at his side, the witness responded in the affirmative to several leading questions and then at the behest of the trial court communicated what the interpreter felt to be "correct" negative answers to several other questions.

At the conclusion of this examination, the following colloquy ensued between the trial court and defense counsel:

THE COURT: Okay. Are you going to take objection to his testifying.

DEFENSE COUNSEL: Absolutely, Your Honor. We don't feel this is competent

testimony. I don't think it has been proven the gentleman understands the questions and as far as his responses are concerned they have been very unclear. And when he has answered incorrectly they [the prosecutor] ask him again and again until he gets a correct answer. I just don't feel like this is an appropriate situation for this kind of testimony.

THE COURT: Well, it appears to me, although he is disabled, he does appear to understand the questions put to him. And I don't—while I don't always understand the responses, *she appears to understand the responses* and she knows him better and [sic] I do. So over your objection I am going to admit that testimony . . . Because the weight of it—the admissibility is for me but the weight is for the jury.

After the jury had been brought back into the courtroom, defense counsel renewed his initial objection and additionally noted:

"That this lady, there has been no foundation laid for the appropriateness of her testimony, nor do we have any evidence that she is in fact able to interpret his—"

The trial court overruled this objection pointing out that he would eventually charge the jury that they were the sole judges of the credibility of the witnesses and the weight to be given their testimony.

The interpreter was sworn and in the presence of the jury, the trial court permitted Keilmann, Sr. to "testify" about the events on the day of the offense. It was thereby brought out that the witness and his late wife went to the Finney ranch on July 21, 1977 in the family pickup truck. Upon arriving at the ranch, the witness was apparently pulled out of the truck by a black man with a gun. Though the witness first denied that the gun was in fact a rifle, he later indicated that his assailant pointed a rifle at him. The witness was said to have communicated that after his wife got out of the truck, he did not see where she went nor did he see anyone strike her.

When asked if he could point out his assailant in the courtroom, the interpreter noted that the witness did not seem to understand the question.[3] The prosecution suggested that appellant stand to facilitate the identification process to which appellant objected. The trial court sustained the objection. The witness was then asked if he remembered what the man who pulled him out of the truck looked like to which he responded no. The witness then pointed at *someone* and in response to whether that someone was the man he saw at the Finney ranch, the interpreter noted the answer was yes. The record, however, is unclear as to whom he was pointing.

On cross examination, the witness was asked to point to the man he saw at the Finney ranch and the following exchange occurred:

DEFENSE COUNSEL: Let the record reflect that the witness pointed at this man standing to my right in the red jacket. Let the record reflect the man pointed again to my left at the defendant.

THE COURT: *I can't tell from my angle which way he is pointing, Counsel.*

PROSECUTOR: Your Honor, the last time he pointed he pointed at the defendant.

DEFENSE COUNSEL: The first time he pointed at the man in the red jacket, Your Honor.

THE COURT: I am going to overrule both your objections. Let's proceed.

The witness then contradicted the earlier interpretation by agreeing that he in fact saw a man strike his wife. When asked if there were two men at the Finney ranch that day, the interpreter responded that the witness did not know. Finally, the witness indicated that the man who pulled him out of the truck later moved the truck from where it had been parked.

Appellant filed two formal Bills of Exception, one of which recorded the fact that

when called upon to point out his assailant, the witness first pointed to a man in a red jacket and then pointed to appellant, and that the trial court failed to let the record reflect this occurrence. The Bill further noted that counsel for appellant was in a much better position to see where the witness was pointing inasmuch as the trial court sat at an oblique angle to the witness's line of sight. The trial court disapproved the Bill noting that:

"Who the defendant pointed to when the defendant and another black man were placed together reflects in the record and having happened in open court on the record is not proper subject [sic] of bill of exception."

Appellant then filed a Bystander's Bill of Exception duly signed and sworn to by three witnesses and which comported with the requisites for such Bills pursuant to Article 40.09, subd. 6(a), V.A.C.C.P.; see also *Garcia v. State*, 522 S.W.2d 203, 209 (Tex.Cr.App.1975), to the same effect as his formal Bill.

■ Statutorily held incompetent to testify is a person who appears not to possess sufficient intellect to relate transactions inquired about or who does not understand the obligation of an oath, Article 38.06, V.A.C.C.P.

■ It has also been said that there are three elements which must be considered in determining whether a witness is in fact competent to testify. The first is a capacity to observe intelligently at the time of the events in question. The other elements of capacity are recollection and narration, though the former is usually merged into the latter. See 1 Texas Practice, §§ 271, 252–253, Evidence (2d ed.), McCormick & Ray. The capacity to narrate involves on the one hand, both an ability to understand the questions asked and to frame intelligent answers and, on the other hand, a moral responsibility to tell the truth. If a person

---

**3.** In the text we summarize what occurred, but, because of the critical nature of this matter of

identification, in an appendix we set out more completely how the matter was developed.

afflicted with a physical or mental disability possesses sufficient intelligence to receive correct impressions of events he sees, retains clear recollection of them and *is able to communicate them through some means* there is no reason for rejecting his testimony. *Id.,* § 275, at 258.

■ It is uncontradicted that Keilmann had the ability to observe the events as they occurred, though the record is something less than lucid as to his recollection and is replete with problems of narration, as that term is defined above. Of course, the issue of a witness's competency is generally a question for the trial court and its ruling in that regard will not be disturbed on appeal unless an abuse of discretion can be shown. *Clark v. State,* 558 S.W.2d 887 (Tex.Cr.App. 1977); *Fields v. State,* 500 S.W.2d 500 (Tex. Cr.App.1973); *Melton v. State,* 442 S.W.2d 687 (Tex.Cr.App.1969). A detailed examination of the witness's testimony compels us to hold, however, that there was such an abuse of discretion by the trial court in permitting the witness to testify.

■ This Court is in agreement with the cited authority insofar as the proposition is concerned that to be competent to testify, a witness must "possess sufficient intellect to relate transactions with respect to which they are interrogated" as well as understand the obligation of an oath. See, e. g., *Bielecki v. State,* 140 Tex.Cr.R. 355, 145 S.W.2d 189, 190 (1940). Aside from the fact that there was no showing that the witness understood an obligation for the oath,[4] the trial judge himself recognized early on the problems inherent in attempting to have the witness testify. Indeed, the trial court

cautioned counsel for the State during the hearing on the witness's ability to testify outside of the presence of the jury that "[t]he problem is do we understand the response [of the witness] and is our understanding enough that he can testify," and later, he commented, "[t]here is a serious question as to whether he can testify about this . . ." The contradictory nature of the witness's responses, his inability to distinguish or otherwise "communicate" negative as opposed to affirmative answers, notwithstanding the leading nature of the questions asked him, all militate towards a finding that the witness was incapable of "narration" as that term is defined by commentators.

The State, however, boldly asserts in its brief that "it is evident from the record that the witness Keilmann had no trouble communicating with those who were accustomed to talk [sic] with him." State's Brief at 5. This assertion is without support in the record before us.[5] The State's correlative contention that the witness's contradictory answers and ability to respond only to leading questions do not render him incompetent blinks at the very definition of what "competence" entails.

In support of this contention, the State would have us follow *Villarreal v. State,* 576 S.W.2d 51 (Tex.Cr.App.1979) and *Davis v. State,* 100 Tex.Cr.R. 617, 272 S.W. 480 (1925). We find neither to be persuasive given their distinguishing features from the instant case. In *Davis,* the complainant was a 22 year old with the intelligence level of a ten year old. From birth, she had been afflicted with a physical disability which interfered with her speech and left her

---

4. Though the court reporter dutifully recited that Keilmann was duly cautioned and sworn to tell the truth, etc., he was never questioned as to whether he actually understood the oath.

5. Just such a representation was made to the trial court by the brother-in-law in suggesting the unsuccessful method of using "yes" and "no" cards. Earlier in the trial Keilmann Junior, asked if his father were able to communicate with *him,* answered, "No. He is not. Just

by signs and stuff like that." At the scene of the crime while his father was still there, all Keilmann Junior could learn from his father was that "my mom was in some kind of trouble because he kept pointing back over there and he was making . . . a sign like a gun . . ." The son later drove his father away and was "not really" able to determine from him what happened, explaining "he was telling me but I didn't find out all of it."

arms and hands in a state of partial paralysis. But it was shown that she was able to *understand* simply couched questions asked of her, unlike the witness Keilmann, and she responded herself, (*partly in words* and partly by signs), with answers, which to the Court "appeared to be intelligible," 272 S.W. at 481. Rejecting a complaint concerning the leading nature of questions put to her, the Court stressed the fact that the complainant "appeared to understand all questions asked her and *answered them with fair intelligence.*" Id. at 482. In the case at bar, there is no showing from this record that Keilmann answered those questions propounded to him "with fair intelligence" or in a manner which "appeared to be intelligible." Moreover, there is no affirmative showing in the record before us that Keilmann understood the obligations of the oath, as was demonstrated by the complainant in *Davis.* Most significantly Keilmann was unable to recollect or narrate with such a degree of trustworthiness as to obviate the need for interpretation, unlike the witness in *Davis* who communicated directly.

In *Villarreal,* the competency of the witness Gonzales was challenged. Gonzales was a deaf mute with an intelligence quotient on the borderline of dull to normal and a reading ability commensurate with a first or second grade student. Testifying through an interpreter, the witness demonstrated an appreciation for the oath and as this Court pointed out:

"Although Lucy Gonzales was able to testify during the trial only in simple terms, and relied heavily on photographic exhibits, *she was fully able to relate her experiences.*"

576 S.W.2d at 57.

*Villarreal* is distinguishable in several ways from the instant case. At the outset, the witness in *Villarreal* was vouched for by an assistant superintendent for the Texas School for the Deaf; she testified through an interpreter whose qualifications were unchallenged [6] and who was fully able to understand the sign language and pantomime used by the witness.[7] In the case at bar, this record does not affirmatively indicate that the "interpreter" was even arguably qualified or experienced enough accurately to interpret the litany of signs, sounds and body movements of the witness. The witness in *Villarreal* also demonstrated an appreciation for the oath and evidenced a showing that she was able to comprehend the nature and quality of her own testimony.

█ Appointment of the interpreter in the case at bar compounded an already evident abuse of discretion, inasmuch as there was no showing that the individual was in fact qualified to "interpret" the witness's testimony. Articles 38.30 and 38.31, V.A.C. C.P., presently providing for the appointment of interpreters for non-English speakers and deaf persons, respectively, both mandate that such an interpreter be qualified.[8]

The situation in the case at bar is different from those provided for by Articles

---

**6.** As to an interpreter for a deaf mute person, see discussion *post.*

**7.** An examination of the trial record in *Villarreal* reveals an enlightening observation made by one John Lloyd, the Director of the Nueces/San Patricio Bi-County School for the Deaf on the nuances of qualified interpretation:
"However, in this situation, the person or persons who do assume this responsibility [interpreting] need to be very, very good at working with someone with a very, very low vocabulary, because if someone from the Registry who may know every sign in the [deaf-mute] language, and of course, there are thousands of them, if it were someone

from the Registry, they still may not be able to do an effective job because Lucy [the witness] doesn't know these signs.
"It is not like if we had a school situation and we were talking about selecting someone to work with her over a year or two, and yet, all of the words she does not understand may be taught to her; but that, of course, is not the situation here."
*Villarreal v. State,* supra, Statement of Facts, Volume II at 214–15.

**8.** Article 38.30 permits an added safeguard if the only available interpreter "is not considered to possess adequate interpreting skills for the particular situation," while Article 38.31 ex-

38.30 and 38.31, supra, in that the Code of Criminal Procedure does not expressly authorize an interpreter to assist individuals who are suffering from physical or mental disabilities not tantamount to deafness or muteness. Indeed, appellant advances the contention that for that reason a trial court is not empowered to appoint an interpreter for a witness like the elder Keilmann. While we do not subscribe to that notion, we are of the opinion that should one be appointed the person must be shown to be qualified to so interpret.[9] We have serious doubts about the interpreter's qualification in the case now before us.

To recap, the interpreter in the case at bar was a woman who "had been taking care of" Keilmann for some six months and who felt that she and the witness could "communicate." In eventually deciding that the woman would be permitted to interpret, the trial court stated:

> ". . . . while I don't always understand the responses [of the witness], *she appears to understand the responses* and she knows him better [than] I do."

Simply put, the trial court's own remarks would seem to indicate that there would be no conceivable manner in which the interpreter's "translation" could be tested for obviously there was no one else available to act as an intermediary in that regard. See Article 38.30, supra (person accused may nominate another person to act as intermediary where interpreter might not be familiar with slang or idiom of witness). Indeed, appellant's trial counsel voiced an objection on these very grounds.

Perhaps on retrial, the witness's condition, from the therapy and training that he has undergone in the interim,[10] will be so improved as to obviate the need for an interpreter or to adapt to some other means of communication. Regardless of what may or may not be possible, the trial court abused its discretion in permitting the elder Keilmann to testify in the unusual circumstances presented. Due process, whose essence is fundamental fairness, was denied.

For the errors pointed out, the judgment is reversed and the cause remanded.

### APPENDIX

MR. DE LEON: Ask him if he sees the man who got him out of the truck in the courtroom today.

INTERPRETER: Do you see the man that took you out of the truck in the courtroom today?

MR. DE LEON: Miss Littlefield, ask him to look around and see if he sees that man who got him out of the truck.

MR. SCHARMEN: Would you step aside a little bit?

INTERPRETER: Mr. Keilmann look around the courtroom and see if you see the man that took you out of the truck that day.

INTERPRETER: He didn't understand.

THE COURT: Explain it to him again.

INTERPRETER: Okay. Look around in the room and see if you see the man that took you out of the truck that day. Mr. Keilmann, look around here in the room, look here in the room and see if you see the man that took you out of the truck. Do you see the man that took you out of the

---

pressly defines "qualified interpreter" as "an interpreter for the deaf whose qualifications have been approved by the State Commission for the Deaf."

9. This exchange from the case of *Villarreal v. State*, supra, between counsel and the Director of the School for the Deaf quoted supra, is also instructive in this regard:
   Q: There is a problem, John, that you will contribute in some sense to what she is saying, something she does not intend?

A: Yes, sir; that is a possibility. Yes, sir. It is just as I imagine with a foreign language, you know.
Statement of Facts, supra, Volume II at 213.

10. At one point in exploring possible methods of communicating with him the trial court was informed by a brother-in-law that Keilmann "is learning to write again."

truck? Do you see the man that took you out of the truck?

May I say something?

THE COURT: Yeah.

INTERPRETER: I am not sure he is understanding the question.

MR. SCHARMEN: That is my point exactly, Your Honor.

THE COURT: Well, the fact—

INTERPRETER: Okay. Mr. Keilmann—

THE COURT: Let's abandon that question and go on to something else, Counsel.

MR. DE LEON: Ask him if he got a good look at the man who got him out of the truck.

INTERPRETER: Did you see the man that took you out of the truck? He indicated, yes.

MR. DE LEON: Then ask him if he sees him here today.

INTERPRETER: Do you see that man here today that took you out of the truck? Do you see the man that took you out of the truck here today? Do you see the man here today that took you out of the truck?

THE COURT: Well, he doesn't seem to understand that question, Counsel. He seems to be confused by that. Do you have other questions you want to put on?

MR. DE LEON: Could I have just a second, Your Honor?

THE COURT: Yes, sir.

MR. DE LEON: Can we have the defendant stand, Your Honor?

MR. SCHARMEN: No, Your Honor, I will object to that.

THE COURT: I think the objection is well taken. I think it will single him out. He can either identify him or not. I realize that is critical to your case, but maybe you can approach it some other way. I don't know.

MR. DE LEON: Let me have another second, Your Honor.

THE COURT: All right.

MR. DE LEON: Ask him if he was close to the man who pulled him out of the truck.

INTERPRETER: Mr. Keilmann, were you close to the man that pulled you out of the truck? Were you close to the man that pulled you out of the truck?

MR. SCHARMEN: Your Honor, I think that question is unclear, I think it is difficult to make an answer to that kind of question. He may interpret the word close to mean many different things.

THE COURT: I think the objection is probably well taken. See if you can rephrase that.

MR. DE LEON: Ask him if he remembers what the man looked like.

INTERPRETER: Do you remember what the man looked like that pulled you out of the truck? He indicated, no.

MR. SCHARMEN: Let the record reflect that was a very clear indication of no, too.

THE COURT: A no, is a no, Counsel. Go ahead.

MR. DE LEON: Ask him if the man was a short man.

INTERPRETER: Mr. Keilmann, was the man that pulled you from the truck a short man? He indicated, yes.

MR. DE LEON: Ask him if the man was a fat man?

INTERPRETER: Mr. Keilmann, was the man a fat man? Was the man a fat man? That is, a no.

THE COURT: That is no. All right. Ask him if he can identify the man if he ever sees him again.

INTERPRETER: Mr. Keilmann could you identify the man if you saw him again? He says, yes.

MR. SCHARMEN: Your Honor, that is the opposite answer to the question asked before. He was asked if he could recognize the man and he said no. And here he was.

THE COURT: I asked the question, because I realize it boils down to whether he

can identify him or not, doesn't make any difference if he is fat, thin, tall, skinny or otherwise, if he can't identify him he can't and if he can, he can. That is the whole thing.

MR. DE LEON: Ask Mr. Keilmann if he was pointing at someone.

INTERPRETER: Were you pointing at someone, Mr. Keilmann?

MR. DE LEON: Just now.

INTERPRETER: Did you point to someone just now? He says, no.

MR. DE LEON: Ask him if the the [sic] man that he is pointing at is the man who pulled him out of the truck.

INTERPRETER: The man that you were pointing at, is that the man that pulled you out of the truck? The man that you just pointed at, is that the man that pulled you out of the truck? The man that you pointed at, is that the man that pulled you out of the truck? Yes.

MR. DE LEON: Ask him if it is the same man that you saw at the Finney Ranch?

INTERPRETER: Is that the same man you saw at the Finney's Ranch? He indicated, yes.

(WITNESS POINTING.)

MR. DE LEON: The man that he is pointing at, is that the one that he saw at the Finney Ranch?

INTERPRETER: The man that you were pointing at, is that the man you saw at the Finney's Ranch? He indicated, yes.

MR. DE LEON: Ask him if he is sure about it.

INTERPRETER: Are you sure Mr. Keilmann? He indicated, yes.

MR. DE LEON: Pass the witness, Your Honor.

## CROSS EXAMINATION

MR. SCHARMEN: Mr. Keilmann is this the man you saw at the Finney Ranch?

INTERPRETER: He indicated, no.

MR. SCHARMEN: What was the answer?

INTERPRETER: No.

MR. SCHARMEN: Would you point to the man who you saw at the Finney Ranch?

INTERPRETER: You want me to tell him?

THE COURT: Tell him.

INTERPRETER: Point to the man you saw at the Finney Ranch. Point to the man you saw at the Finney Ranch. Point. Mr. Keilmann, can you point to the man that you saw at the Finney's Ranch? Which man?

MR. SCHARMEN: Let the record reflect that the witness pointed at this man standing to my right in the red jacket.

Let the record reflect the man pointed again to my left at the defendant.

THE COURT: I can't tell from my angle which way he is pointing, Counsel.

MR. DE LEON: Your Honor, the last time he pointed he pointed at the defendant.

MR. SCHARMEN: The first time he pointed at the man in the red jacket, Your Honor.

THE COURT: I am going to overrule both your objections. Let's proceed. Do you have any other questions you want to ask him? [sic]