Court of Appeals
Fourth Court of Appeals District of Texas
San Antonio



★ ★ ★  ★ ★ ★

# MEMORANDUM OPINION

No. 04-11-00384-CR

Ausencio Jimenez **LURIA**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 175th Judicial District Court, Bexar County, Texas
Trial Court No. 2010-CR-0772
Honorable Sharon MacRae, Judge Presiding[1]

Opinion by:    Phylis J. Speedlin, Justice

Sitting:    Karen Angelini, Justice
Sandee Bryan Marion, Justice
Phylis J. Speedlin, Justice

Delivered and Filed:  October 17, 2012

AFFIRMED

Ausencio Luria appeals his conviction on two counts of aggravated sexual assault of a disabled person, asserting that the evidence is legally insufficient to support the jury's verdict and that the trial court erred in declaring the victim competent to testify.  We affirm the trial court's judgment.

---

[1] Sitting by assignment.

**BACKGROUND**

On October 17, 2009, R.V., a 19 year-old mentally disabled woman, was being cared for at her aunt Clara Ibarra's house while R.V.'s mother was at work. R.V.'s uncle Manuel Ibarra was not at home because he was working that day with appellant Luria at Luria's Mexican restaurant. Luria was known as "Alex." When Manuel arrived home later that afternoon, he and Luria stayed outside drinking beer. R.V. came outside to greet them. Luria was married to a cousin of the Ibarra family and had known R.V. since she was a little girl. Luria asked R.V. if she would like to go to his house to see her cousin Alejandra, Luria's 17 year-old daughter; R.V. replied that she wanted to go. R.V. left with Luria without getting permission from Clara. Instead of going to his house, Luria drove R.V. to his restaurant and took her inside where he sexually assaulted her. Clara became worried about R.V.'s absence and began calling her cell phone and other family members in an effort to track her down. Clara, along with other worried family members, drove over to Luria's house and found R.V. there. She was crying and had several bruises, or hickies, on her neck which she did not have that morning. The family called the police. The police interviewed R.V. and Luria, and then took R.V., accompanied by her mother, to the hospital for a sexual assault examination. The physical examination showed that R.V. had tears in her vagina and anus.

Luria was indicted on three counts of aggravated sexual assault of R.V., alleged to have been committed on or about October 17, 2009. A jury convicted him of two of the three counts. At the conclusion of the punishment phase, the jury recommended a term of imprisonment of fifty-two years plus a $10,000 fine on each count. The trial court imposed sentence in accordance with the jury's recommendation and ordered the sentences to run concurrently. Luria now appeals.

## LEGAL SUFFICIENCY

In his first issue, Luria asserts the evidence is legally insufficient to support his conviction on Counts One and Two because there is no physical, scientific, or testimonial evidence that his male sexual organ penetrated R.V.'s sexual organ or anus. Luria points out that his DNA was only found on R.V.'s neck and breast, and not on R.V.'s genitals, and that R.V. never said his penis penetrated her vagina or anus; he also cites the SANE[2] nurse's statement that the vaginal and anal tears could have been caused by something other than sexual intercourse. In reviewing the legal sufficiency of the evidence, we determine whether, viewing all the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010). In conducting a legal sufficiency review, we defer to the jury's assessment of the credibility of the witnesses and the weight to be given to their testimony. *Brooks*, 323 S.W.3d at 899.

Luria was convicted of intentionally and knowingly causing the penetration of R.V.'s female sexual organ by his male sexual organ (Count 1), and causing the penetration of R.V.'s anus by his sexual organ (Count 2), without R.V.'s effective consent in that Luria knew that, as a result of mental disease or defect, R.V. was incapable of either appraising the nature of the act or of resisting it.[3] *See* TEX. PENAL CODE ANN. § 22.021(a)(1)(A)(i), (a)(2)(C) (West Supp. 2012) (aggravated sexual assault of a disabled individual). Luria only challenges the sufficiency of the evidence on the element of penetration.

---

[2] Sexual Assault Nurse Examiner

[3] The jury found Luria "not guilty" on Count 3 alleging that he caused R.V.'s female sexual organ to come in contact with his mouth.

The trial evidence consisted of testimony by R.V. and her family members, the detectives who interviewed R.V. and Luria, a SANE nurse and an expert on child sexual abuse, plus R.V.'s medical records and DNA evidence.

Martin Valenzuela, one of R.V.'s uncles, testified that on the evening of the incident, he received a call from Clara that R.V. was with Luria and she could not reach R.V. Valenzuela called R.V.'s cell phone and she answered, sounding "nervous." Valenzuela told her to hand the phone to Luria. When he asked Luria why he had taken R.V. without permission and told Luria to bring R.V. over to him, Luria hung up. Valenzuela called back and R.V. answered again; he could hear Luria's voice in the background telling her to hang up. There was a click but the call did not disconnect, and Valenzuela overheard R.V. saying that he had taken her "to where he was making tacos" and that "if she ever had a baby then it was going to be his because he was the only one that had been with her." Valenzuela also overheard Luria tell R.V. to "keep quiet, not say anything, because they are not going to do anything to him." Valenzuela got upset and called Luria's wife, Lupita, to tell her he was coming over to the house. On his way, Lupita called him back and told him that Luria had arrived "upset and drunk," and had kicked her out of the house; Lupita had taken R.V. with her. Valenzuela drove over and found them a few blocks down the street from Luria's house. He immediately noticed that R.V. had marks on her neck and breast. Valenzuela called the police and waited for them in front of Luria's house. R.V. kept her head down and cried. Clara and R.V.'s mother arrived, and R.V. went to the hospital for an exam with her mother.

San Antonio Police Detective Humberto Carlos Bernal interviewed R.V. on video. R.V. said Luria "kissed" her "down there," and pointed to her vaginal area and her rear end; she also said he kissed her neck and breast and then pointed to "her crotch" and "her behind." Bernal

asked if Luria did anything else, and R.V. said "no." R.V. did not say Luria's "penis penetrated her vagina or anus" – she did not use those words. Bernal kept his interview short, anticipating a longer interview of R.V. at Child Safe because that is who usually does the forensic interview with children or mentally disabled victims of sexual assault. Bernal stated that if he had known his would be the only interview of R.V., he would have asked follow-up questions regarding specific body parts.

Luria gave two video statements to police, which were admitted into evidence. In his first statement, Luria stated that R.V. stayed in the truck while he went inside the restaurant; he claimed that he did nothing at all to R.V. In his second statement, Luria at first repeated his denial that anything happened with R.V., but admitted drinking beer that night. Finally, after being asked how he would explain his DNA on R.V. and how the marks got on her neck, Luria admitted kissing R.V. while in the truck. Luria said he kissed R.V. on her mouth and neck, and admitted to "touching her butt," but said that was all that happened; he denied kissing her breast and denied any other sexual conduct with R.V.

SANE nurse Shannon Padilla testified that her physical examination of R.V., performed on the evening of the assault, revealed a "large red tear to the inner labia minora" near the vaginal opening, and a "small red linear tear to the anal opening" with a lot of swelling around the anal opening, both of which are indicative of some sort of trauma to the area within the last 24 to 48 hours. On cross-examination, Padilla conceded there may be explanations for such injuries other than sexual assault. Padilla also observed multiple circular bruises on the side and back of R.V.'s neck and on her right breast. R.V.'s medical records and photographs documenting Padilla's findings were admitted into evidence. Padilla also testified she took swabs from R.V.'s genital areas and the bruises on her neck and breast for DNA testing. When

asked whether the absence of DNA would mean no penetration occurred, Padilla explained that if a suspect wore a condom, or if the victim urinated afterward, one would not expect to find DNA or semen inside the vaginal canal. Padilla also conducted an examination of Luria, and collected DNA samples from his mouth, hands, and penis, and took hair samples.

Jamie Pomykal, a forensic scientist at the Bexar County Criminal Investigation Laboratory, testified about the DNA testing she performed on the samples submitted from R.V. and Luria. Pomykal stated that Luria's DNA was present on R.V.'s pants and in his saliva on R.V.'s right breast and all the neck swabs; however, the vaginal and rectal swabs taken from R.V. did not show the presence of any foreign DNA, i.e., no DNA other than R.V.'s own. Pomykal testified that if a suspect wore a condom properly, or did not ejaculate, she would not expect to find the suspect's DNA on the female vaginal area. As to the swab taken from Luria's penis, the testing was "inconclusive," with Luria being the main contributor and a second unidentified contributor in the DNA mixture; Pomykal conceded the second contributor could have been Luria's wife, with whom Luria stated he had sex that morning.

After a hearing to determine her competence to testify, R.V. took the stand. On direct examination, she acknowledged knowing Luria, who she referred to by his first name "Alex," and stated she had known him since she was a little girl. When asked, "And did Alex ever hurt you?" R.V. said "yes." R.V. testified, in response to short simple questions, that she was going to her aunt's house, but Alex took her to "where my mother worked,"[4] "where they were making tacos." R.V. stated that she fell down "where they wash the dishes" and that is where Alex hurt her; she was running because of Alex. When asked to "tell me where he hurt you?" R.V. pointed to a doll's vaginal area; when asked, "Where else did he touch you?" R.V. pointed to the doll's neck. When asked, "And what was he doing up here?" R.V. answered "kisses." When the

---

[4] There was evidence that R.V.'s mother, Ana, had worked at Luria's restaurant.

prosecutor asked, "And where else?" R.V. said, "Down here" and pointed to the vaginal area of the doll. And, when asked "if he hurt you anywhere else?" R.V. turned the doll over and said "here," pointing to the doll's anal area. When asked, "What did you see on Alex?" R.V. pointed to the genital area of a male doll; asked what do you call that area, R.V. said "Huevos. Balls." When asked, "And was Alex using his huevos to hurt you?" R.V. answered, "Yes." When asked, "What was Alex saying to you?" R.V. stated, "That don't say anything to my father, my mother, or my uncles." When asked where Luria's hands were, R.V. indicated the vaginal area of the female doll. When the prosecutor asked her, "And what about your hands? Where were your hands?" R.V. stated, "Like so," and put both of the female doll's hands behind the body. Finally, when asked, "where were your clothes," she said, "Down there," indicating the floor; when asked, "Who took them off?" she stated, "Alex."

On cross-examination, R.V. said "yes" when asked if she knows where the "vagina" is on a woman's body, and she correctly pointed to it on the female doll; she also said "yes" when asked if it is under the doll's dress. When asked to point to the "penis" on the male doll, R.V. did so correctly; she also correctly identified the doll's head, hand, and knee. When defense counsel asked R.V. to explain "how Alex hurt you," R.V. indicated and said, "He would put that here." When questioned more specifically, R.V. said Alex touched her in the area she confirmed was her "vagina" with his "penis." When asked, "Did he do anything else with his penis?" R.V. said, "yes" and pointed "at the anal portion of the female doll." R.V. testified she told "my mom, my uncle, everybody" what Alex did to her; she remembered talking to Detective Bernal about where Alex kissed her, but conceded she did not tell Bernal about the other conduct she had demonstrated using the dolls. Finally, defense counsel asked, "[R.V.], if I say to you that I know someone who is pregnant, what does that mean to you?" R.V. answered, "If I have this - -

a child from Alex, then I know he's going to be the child's father." In response to the question, "So you know that you can become pregnant?" R.V. answered, "Yes," and stated her mother explained it "[w]hen my mother noticed I was no longer a child or a baby." R.V. stated "yes" that she thought she could be pregnant by Alex; further questioning showed that she was not in fact pregnant. When defense counsel asked, "[R.V.], do you think you can get pregnant by kissing?" she also answered, "Yes."

Finally, Dr. Nancy Kellogg, an expert on child sexual abuse and the medical director of Child Safe, testified. Based on her observations of R.V. during trial, Dr. Kellogg's opinion was that R.V. has the mental function of a 4 or 5 year-old child "based on how short and simple the question had to be or the comments had to be for her to understand it." She disagreed that R.V. functions at a mental age of 9 to 10 years old, as testified to by a family member. Dr. Kellogg testified that a four-year-old child's concept of numbers is not very good, and they often do not know their colors and may not be able to name their body parts. She stated that young children may use a doll or drawing to demonstrate what happened to them better than they can articulate it. Dr. Kellogg stated that mentally disabled individuals may not have a full understanding of how their own body works, for example, they may know that "sex means baby" but they do not understand anything in between. Dr. Kellogg stated it is more important for them to describe "what body parts touched what body parts" than to label a body part with a term. Dr. Kellogg also explained that children commonly do not tell the whole story to the first person they tell due to fear, shame, and guilt; it is common for a child to reveal more as they continue telling the story.

Child victims of sexual assault are afforded great latitude when testifying, and the use of anatomically correct dolls to assist the child in conveying the substance of her testimony is well

accepted. *Villalon v. State*, 791 S.W.2d 130, 133-34 (Tex. Crim. App. 1990); *Hiatt v. State*, 319 S.W.3d 115, 121 (Tex. App.—San Antonio 2010, pet. ref'd). The uncorroborated testimony of a child victim is alone sufficient to support a conviction for aggravated sexual assault. *Hiatt*, 319 S.W.3d at 121. Further, there is no requirement that the victim be able to testify as to "penetration" per se. *Villalon*, 791 S.W.2d at 133; *Zuniga v. State*, 811 S.W.2d 177, 179-80 (Tex. App.—San Antonio 1991, no pet.) (child victim need not testify in terms of statutory language, but may use unsophisticated language to describe sexual assault in manner sufficient to sustain conviction). "Penetration" within the meaning of the aggravated sexual assault statute occurs when there is contact with the female sexual organ that can reasonably be regarded as more intrusive than contact with the outer vaginal lips. *Cornet v. State*, 359 S.W.3d 217, 226 (Tex. Crim. App. 2012); *Vernon v. State*, 841 S.W.2d 407, 409-10 (Tex. Crim. App. 1992) ("contact beneath the fold of the external genitalia," known as the labia majora, constitutes "penetration" within the meaning of aggravated sexual assault; penetration of the vaginal canal is not required, only penetration of the female "sexual organ").

Viewing the evidence in the light most favorable to the jury's verdict, we conclude that R.V.'s testimony describing and demonstrating how Luria "hurt" her in her vaginal and anal areas, including her confirmation on cross-examination that Luria hurt her by using his "penis" to touch her "vagina" and her anal area, plus the corroborating medical evidence showing that R.V. had a "large red tear to the inner labia minora" near the vaginal opening and a "small red linear tear to the anal opening," is legally sufficient for a rational fact finder to find that Luria's penis penetrated R.V.'s female sexual organ and anus. *Brooks*, 323 S.W.3d at 899; *see Villalon*, 791 S.W.2d at 133-34 (recognizing that child victims cannot be expected to testify with the same clarity and ability as adults, and holding that child's use of anatomically correct dolls to

demonstrate defendant's actions, along with her testimony that defendant was on top of her "doing bad things" "with the one he pees" and trying to "put it where [she] pee[s]" was sufficient to establish the penetration element of aggravated sexual assault); *see also Jones v. State*, 900 S.W.2d 392, 399 (Tex. App.—San Antonio 1995, pet. ref'd) (holding that "jury could properly conclude from common knowledge what part of the behind would hurt when 'touched' with a penis, and what force is required," and that "[c]ontacting this area that is 'not usually exposed to view, even in nakedness, is a significant intrusion beyond mere external contact" that constitutes "penetration" of the anus within the meaning of section 22.021). Accordingly, we overrule Luria's first issue.

## COMPETENCE OF VICTIM TO TESTIFY

Luria's second issue asserts that the trial court abused its discretion in finding that R.V. was competent to testify and in permitting her to testify at trial because her mental disability prevented her from intelligently perceiving and recollecting the events at issue, and from being able to adequately narrate her recollection of the events. *See* TEX. R. EVID. 601(a)(2) (children and other persons who, after being examined by the court, appear not to possess sufficient intellect to relate transactions with respect to which they are interrogated are incompetent to testify as a witness). Luria particularly challenges R.V.'s ability to adequately narrate the facts, arguing that she used dolls to demonstrate the events, was unable to "give basic anatomical information that the Appellant's sexual organ penetrated her sexual organ or anus," and mainly answered "yes" to the State's questions.

The State argues that Luria failed to preserve this issue for review because he only requested a hearing on competence, which was provided, and did not object to the court's ruling at the conclusion of the hearing. Luria filed a written "Motion for Hearing of Witness

Competence" prior to R.V.'s testimony. Luria's motion asserted that R.V. was not competent to testify due to her mental deficiency, requested a hearing into her competency pursuant to Rule 601(a)(2), and requested that her testimony be excluded as incompetent upon conclusion of the hearing. The trial court signed a written order granting the request for a hearing on competence. During trial, the court held a hearing on R.V.'s competence outside the jury's presence; at the conclusion of the hearing, the court ruled that R.V. would be permitted to testify. Luria did not object to the court's ruling. R.V. proceeded to testify on direct examination; during cross-examination, the defense "re-urged its objection" to R.V.'s competence and the objection was overruled. Luria's motion did not merely request a hearing outside the jury's presence, but also sought exclusion of R.V.'s testimony at the conclusion of the hearing. As such, it was a timely request stating the specific grounds for exclusion of the evidence which was pursued to an adverse ruling admitting the evidence. *See* TEX. R. APP. P. 33.1(a). By obtaining an adverse ruling on the admissibility of the evidence outside the jury's presence, Luria preserved his complaint that R.V. was not competent to testify. *See* TEX. R. EVID. 103(a)(1) ("When the court hears objections to offered evidence out of the presence of the jury and rules that such evidence be admitted, such objections shall be deemed to apply to such evidence when it is admitted before the jury without the necessity of repeating those objections."); *Geuder v. State*, 115 S.W.3d 11, 13-14 (Tex. Crim. App. 2003).

Turning to the merits of Luria's issue, we review a trial court's decision under Rule 601(a)(2) as to whether a witness is competent to testify under the abuse of discretion standard. *Broussard v. State*, 910 S.W.2d 952, 960 (Tex. Crim. App. 1995); *De Los Santos v. State*, 219 S.W.3d 71, 80 (Tex. App.—San Antonio 2006, no pet.). As a general rule, every person is presumed competent to testify. TEX. R. EVID. 601(a); *Fox v. State*, 175 S.W.3d 475, 480 (Tex.

App.—Texarkana 2005, pet. ref'd). Under Rule 601(a)(2), a child or other person is competent to testify unless, after being examined by the trial court, it appears to the court that the child or other person does not possess sufficient intellect to relate the transactions with respect to which she is interrogated. TEX. R. EVID. 601(a)(2); *Broussard*, 910 S.W.2d at 960. In determining a witness's competence, a trial court considers the following three factors: (1) the ability of the person to intelligently observe the events at the time of their occurrence; (2) the person's capacity to recollect the events; and (3) the person's capacity to narrate the events. *Torres v. State*, 33 S.W.3d 252, 255 (Tex. Crim. App. 2000). "The third element requires the witness to be able to understand the questions that are asked, to be able to frame intelligent answers to those questions, and to be able to understand the moral responsibility to tell the truth." *Escamilla v. State*, 334 S.W.3d 263, 266 (Tex. App.—San Antonio 2010, pet. ref'd). In determining whether there has been an abuse of discretion, we review both the competency hearing and the witness's testimony at trial. *De Los Santos*, 219 S.W.3d at 80-81; *In re A.W.*, 147 S.W.3d 632, 634 (Tex. App.—San Antonio 2004, no pet.).

At the competency hearing, R.V. stated her nickname and the first names of her mother and sister, and their dog. R.V. stated that she would tell the truth when asked questions, and indicated she knew the difference between the truth and a lie by correctly answering "not true" when the male prosecutor asked if he was a girl and if she was a boy. With respect to her ability to narrate a fact scenario, R.V. answered questions about how her Uncle Martin did her braids the day before while she was watching TV. At that point, the trial court found that R.V. was competent to testify.

During trial, R.V. testified as set forth above in Issue No. 1. She recollected and narrated the events of the day when Luria hurt her in response to simple, short questions, stating that

Luria took her to the place "where they make tacos," that she was running and fell down "where they wash the dishes," Luria gave her "kisses" on her neck where she later had bruises, and Luria "hurt" her in her vaginal and anal areas with his "penis." While R.V. used female and male dolls to demonstrate, she appropriately identified the dolls' body parts, including the female doll's "vagina" and the male doll's "penis." As noted, supra, Dr. Kellogg testified that, based on her observations of R.V., her opinion was that R.V. functions at the mental level of a 4 or 5 year-old child. Dr. Kellogg stated that she would expect a person with a 4 or 5 year-old mental level to be able to tell what body parts were touching, who did it by the name they use for the person, whether it happened once or more than once, and where it happened. Through her testimony and demonstrations, R.V. conveyed all of that information to the jury.

Luria argues that R.V. should not have been permitted to testify because she lacked the ability to intelligently observe the events as they happened, and to recollect and narrate the events at trial. *See Torres*, 33 S.W.3d at 255 (stating the three factors considered in determining a witness's competence to testify). Luria points out that R.V. could not answer every question asked and made some incorrect statements. For example, when questioned by defense counsel during cross-examination, R.V. could not state the day of the week or year and could not name her body parts; in addition, she mistakenly said "true" when asked whether the legal pad was blue. R.V. also stated that she thought she could get pregnant by "kissing." Detective Bernal, who interviewed R.V., stated that communication with her was "difficult," and she could not tell him her last name, how old she was, or the color of the wall. Bernal further stated that when he asked R.V. if her hair was red, she said "yes," but her hair is black; when he asked if he said the sky was red would that be true, she said "yes."

Here, R.V. showed she had the ability to intelligently perceive the events, recollect them, and convey them using a combination of words and demonstrative dolls. *See id.* It is not necessary that a child witness, or witness with the mental function of a child, testify using the anatomically correct terms. *Villalon*, 791 S.W.2d at 133; *Zuniga*, 811 S.W.2d at 179-80. Further, it is well established that "[i]f a person afflicted with a physical or mental disability possesses sufficient intelligence to receive correct impressions of events he sees, retains clear recollection of them and is able to communicate them through some means there is no reason for rejecting his testimony." *Watson v. State*, 596 S.W.2d 867, 870-71 (Tex. Crim. App. [Panel Op.] 1980); *see Solis v. State*, 647 S.W.2d 95, 98 (Tex. App.—San Antonio 1983, no pet.) (mentally disabled rape victim was competent witness). In *Escamilla*, we rejected arguments similar to those raised by Luria that a three and one-half year-old child with mental illness who testified using dolls to demonstrate sexual abuse was an incompetent witness because she was "not verbal enough," lacked the ability to narrate the events, and did not understand the difference between the truth and a lie; we held the court did not abuse its discretion in permitting the witness to testify. *Escamilla*, 334 S.W.3d at 266; *see Kalka v. State*, No. 07-02-0462-CR, 2003 WL 22387043, at *3 (Tex. App.—Amarillo Oct. 20, 2003, pet. ref'd) (not designated for publication) (19 year-old victim with mental capacity of a six or seven year-old child was competent to testify in aggravated sexual assault trial, as "mental retardation does not make the recollections of its victims 'inherently untrustworthy;' rather, it simply affects the weight a juror may assign to their testimony"); *see also Berotte v. State*, 992 S.W.2d 13, 17-18 (Tex. App.—Houston [1st Dist.] 1997, pet. ref'd) (four year-old child witness frequently nodded or shrugged in response to questions, her best verbal answers were in response to leading questions, and much of her testimony was contradictory and confusing, but trial court did not abuse its discretion in

permitting the child to testify because she appeared to have the intellectual ability to relate the events and to understand the obligation to be truthful). Finally, to the extent that Luria relies on instances of confusing or contradictory statements by R.V., we note that inconsistent or confusing responses are matters of credibility to be assessed by the jury, not matters of competence. *Escamilla*, 334 S.W.3d at 266; *In re A.W.*, 147 S.W.3d at 635. Viewing R.V.'s testimony in its entirety, and deferring to the trial judge "who was there to personally evaluate the child and her responses," we hold the trial court did not abuse its discretion in finding R.V. competent to testify. *Escamilla*, 334 S.W.3d at 267. We overrule Luria's second issue.

Based on the foregoing reasons, we affirm the trial court's judgment.

Phylis J. Speedlin, Justice

DO NOT PUBLISH