**Affirmed and Opinion filed October 22, 2013.**



In The

# Fourteenth Court of Appeals

## NO. 14-12-00711-CR

**ALESTER D. HOGAN, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 176th District Court**
**Harris County, Texas**
**Trial Court Cause No. 1344349**

## O P I N I O N

A jury convicted appellant Alester D. Hogan of sexual assault and assessed an enhanced sentence of confinement for 30 years. We affirm.

## BACKGROUND

Complainant was 19 years old at the time of the offense, and she is moderately mentally retarded.[1] Complainant was leaving a gas station on the

---

[1] At trial, Dr. Valorie King testified that complainant has an IQ of 53. A person with an

evening of June 23, 2010, when appellant approached her and offered her a ride home. When complainant refused, appellant forced her into his truck; took her to his house; and sexually assaulted her. After the assault, complainant went to a nearby neighbor's house and requested that the neighbor call the police because she had been sexually assaulted. The police arrived and complainant was transported to the hospital.

Appellant called the police after complainant left, stating that he had given a girl a ride to his house but had asked her to leave after she tried to have sex with him. Appellant consented to a search of his house. Forensic evidence revealed that DNA collected from the master bedroom was consistent with both complainant and appellant. Further, DNA collected from complainant's breast matched DNA of appellant. Appellant maintained that he did not have sexual relations with complainant.

Appellant was charged by indictment with the offense of sexual assault in violation of Texas Penal Code § 22.011. *See* Tex. Penal Code Ann. § (Vernon 2011). During trial, the court developed concerns about complainant's ability to testify and conducted a hearing to determine whether she was competent. After the hearing and observing complainant on redirect examination, the court found that she was competent to testify. The jury convicted appellant of sexual assault and assessed punishment at 30 years' confinement. This appeal followed.

## ANALYSIS

Appellant raises two issues on appeal. First, appellant contends that the trial court erred in finding complainant legally competent to testify at trial. Second, appellant argues that the jury charge was erroneous.

---

IQ below 70 is considered intellectually disabled. The average IQ of an adult is 100.

2

## I.      Competency

In his first issue, appellant argues that complainant was not competent to testify and that her testimony should have been excluded. Appellant contends that complainant did not understand the questions addressed to her, had difficulty communicating consistent intelligent answers, and did not understand the difference between a truth and a lie.

We review a trial court's competency determination for abuse of discretion. *Rodriguez v. State*, 772 S.W.2d 167, 170 (Tex. App.—Houston [14th Dist.] 1989, pet. ref'd); *Beavers v. State*, 634 S.W.2d 893, 895 (Tex. App.—Houston [1st Dist.] 1982, pet. ref'd). Further, in reviewing a trial court's competency ruling, we consider the witness's entire testimony given both at trial before the jury and at the competency hearing. *See Hernandez v. State*, 643 S.W.2d 397, 400 (Tex. Crim. App. 1982).

Generally, every person is presumed competent to testify. Tex. R. Evid. 601(a). A person is not competent to testify if, after an examination by the trial court, the person does not appear "to possess sufficient intellect to relate transactions with respect to which [she is] interrogated." Tex. R. Evid. 601(a)(2). The court will consider whether the witness possesses (1) the ability to intelligently observe the events in question at the time of the occurrence, (2) the capacity to recollect the events, and (3) the capacity to narrate the events. *Rodriguez*, 772 S.W.2d at 170 (citing *Watson v. State*, 596 S.W.2d 867, 870 (Tex. Crim. App. 1980). The third element involves the ability to understand the moral responsibility to tell the truth, to understand the questions posed, and to frame intelligent answers. *Id.* (citing *Watson*, 596 S.W.2d at 870). If an intellectually disabled person "possesses sufficient intelligence to receive correct impressions of events [she] sees, retains clear recollection of them and is able to communicate

them through some means there is no reason for rejecting [her] testimony." *Watson v. State*, 596 S.W.2d 867, 870-71 (Tex. Crim. App. 1980). At trial, complainant's testimony was occasionally nonresponsive and contradictory. On cross-examination, the following exchange took place:

> DEFENSE COUNSEL: So, you—did—so, in that conversation you told the officer you left through the patio door, right?
>
> COMPLAINANT: Yes.
>
> DEFENSE COUNSEL: Again, why did you tell him that?
>
> COMPLAINANT: (No response)
>
> DEFENSE COUNSEL: Do you understand my question?
>
> COMPLAINANT: (No response)
>
> DEFENSE COUNSEL: My question was: Why did you tell him that?
>
> COMPLAINANT: I don't know.
>
> DEFENSE COUNSEL: You don't know?
>
> COMPLAINANT: (No response)
>
> DEFENSE COUNSEL: Do you tell people what you think they want to hear?
>
> COMPLAINANT: Yes.
>
> *          *          *
>
> DEFENSE COUNSEL: Were you worried about your mom being mad because you left the house that night?
>
> COMPLAINANT: No.
>
> DEFENSE COUNSEL: You weren't? Were you worried about your mom being mad because you'd gone to some other man's house that night?
>
> COMPLAINANT: Yes.
>
> DEFENSE COUNSEL: And that's why you told the police, that's why you told your mom, that's why you told the prosecutors, and that's why you told the jury that you got raped, isn't it?
>
> COMPLAINANT: Yes.

On redirect, complainant admitted that she typically answers "yes" to any question when she becomes tired and no longer wants to talk to anyone. This exchange led the trial court to examine complainant outside of the presence of the jury to determine her competency.

The competency examination testimony included the following exchange:

COURT: Okay. Now, do you know the difference between telling a lie and telling the truth?

COMPLAINANT: Yes.

COURT: What is that difference?

COMPLAINANT: A lie means—a lie means that, that it's not true.

COURT: Okay. But what happens if you say something that's not true?

COMPLAINANT: Then the person won't believe you.

COURT: Uh-huh. What happens if you say something that's not true when you've sworn an oath to come here in the courtroom and tell the truth?

COMPLAINANT: That—that will get you in trouble.

COURT: Yes. Okay. Well—so, for example—now you've just told Mr. Justin that you told everyone that [appellant] raped you because you were afraid your mom was going to be mad at you for going to some man's house, didn't you?

COMPLAINANT: Yes.

COURT: Okay. Was that a true statement?

COMPLAINANT: Yes.

COURT: All right. So, are you telling us that everything you've told them before about this man tying you to his bed and raping you was a lie?

COMPLAINANT: No.

COURT: Well, they can't both be true, ma'am? Do you understand that?

COMPLAINANT: Yes.

COURT: Can you explain to me how both things could be true?

COMPLAINANT: That—that—that is true.

COURT: Okay. Which is true?

COMPLAINANT: That he—he raped me.

COURT: Okay. So, why did you just say what you said? About making it up because you were afraid your mom would be mad at you?

COMPLAINANT: I don't know.

COURT: Okay, ma'am. So, can you see why I might be concerned?

COMPLAINANT: Yes.

COURT: Because you've told me that you understand the importance of telling the truth that you swore an oath to tell; but you're also telling me that you're sitting here just saying, I guess, whatever comes to your mind to say. Now, this is a very serious proceeding. A man's life is on the line. This isn't a game. What do you think is going on here today?

COMPLAINANT: That—that I have to tell the truth.

COURT: Well, what is this about? Why are you here?

COMPLAINANT: About what happened.

COURT: Okay. And when you—when you swore to God to tell the truth, what did that mean to you?

COMPLAINANT: That he—that he knows that I'm— I'm going to tell the truth.

COURT: Okay. But now you're telling me you haven't been telling the truth, right?

COMPLAINANT: I wasn't lying.

COURT: Ma'am, when you don't tell the truth, that's a lie. So, I don't think you really seem to know what a lie is. You sat here under oath; and you said, yes, I tell people whatever they think they want to hear. Do you remember saying that just a few minutes ago?

COMPLAINANT: I don't know what I'm saying.

COURT: Okay. Let's—so, let's get the—do you understand what words mean?

COMPLAINANT: No.

COURT: You don't understand what any words mean?

COMPLAINANT: No.

COURT: And so, when—when you say, I know to tell the truth, does that statement have any meaning to you?

COMPLAINANT: No.

COURT: Okay. So, really, the—the idea of telling the truth is meaningless to you. Is that what you're telling me?

COMPLAINANT: Yes.

COURT: And the idea of telling a lie means nothing to you, as well?

COMPLAINANT: Yes.

*         *         *

PROSECUTION: Judge, every time I've spoken with her, we've gone over this, I went over what I believe that the Defense attorney would ask, and this is the first time that she has responded in this manner. So, this is new.

COURT: Yes.

PROSECUTION: Right.

COURT: But this is what counts.

PROSECUTION: I understand. And what I believe is that she is frustrated. I believe she understands and is just frustrated at the moment. Because even speaking with her mom and the doctor and even the police officer, she closes down when she gets frustrated. So, I do think she understands between—

COURT: Okay.

PROSECUTION: —a lie and the truth, and I believe she understands why she's here and what the importance of it is. I just think that she's right now shutting down because—

COURT: Well—

PROSECUTION: —so many different people are asking you [sic] her questions.

COURT: Well, and I'm—I know she was prepared for that. But here's the deal. Closing down is one thing. Making stuff up is something

7

different. And I don't care how tired she is. Then she needs to just say that, but she can't just say whatever comes to her mind to say.

PROSECUTION: Right.

COURT: I mean, because we'll just—for the next five days, we can have her on the stand; and it could go back and forth and back and forth and—obviously, she's going to say whatever. I guess at some point I'll call a halt to it and let the jury make a decision on what they've heard. I don't know. Let's see how it goes, but I'm going to hold this in abeyance as to whether I'm going do let this go on or not.

DEFENSE COUNSEL: I would ask the Court, for the record, to make a finding as to whether she's competent or not. I n my opinion, unfortunately, it's abundantly clear that—that she's not competent.

COURT: I have reservations. I just said, though, I want to wait and get some more evidence. I want to see how this goes. If I decide that she's not competent—she's answered the boilerplate questions correctly, but I—I believe in going behind those, I agree; and she's not indicated to me—I think that, you know—I don't think you have to be a psychiatrist to figure this out. So, I want to see how she behaves on redirect; and you can have her on recross. And at the end of that, because that's going to be it, then I'll decide.

The next day, after observing complainant on redirect and considering the expert testimony of a doctor, the trial court ruled that complainant was competent to testify.

The court reasoned that complainant's inconsistent testimony affected her credibility, a matter within the province of the jury, not her competency. The court cited *Watson*, concluding that complainant was not incompetent. *See Watson*, 596 S.W2d at 871-72 (court committed reversible error by allowing a witness to testify who was unable to speak except for the expression "uh-huh" and could not be interpreted rationally).

We cannot say on this record that the trial court abused its discretion in finding complainant competent to testify as a witness. First, complainant's testimony demonstrated that she possessed the ability to observe the events in

question at the time of the occurrence and was capable of recollecting the events. Although her responses were contradictory at times, complainant provided sufficient detail about the events in question. She testified that appellant tied her to his bed with sheets, and she told him to get off of her. She also stated that "[appellant] put his penis inside my vagina." She followed with the statement that appellant hurt her, causing her to cry and bleed.

Second, complainant's testimony demonstrated that she was capable of narrating the events. Complainant understood the questions asked of her and was able to frame intelligent answers. At trial, complainant was able to state her name and age. She was able to answer questions about her family and the medication she was taking. Complainant also demonstrated that she understood her moral responsibility to tell the truth. She testified that she knew the difference between a truth and a lie. She stated that "a lie means—a lie means that, it's not true." When the trial court questioned complainant as to what happens if a person says something that is not true under oath, she responded "That—that will get you in trouble."

Although some of complainant's responses were confusing and inconsistent, a witness is not rendered incompetent merely because there are inconsistencies in her testimony. *Beavers*, 634 S.W.2d at 897. Complainant's mental status did not automatically render her incompetent to testify. *See Allen v. State*, 479 S.W.2d 278, 280 (Tex. Crim. App. 1972); *see, e.g., Hernandez,* 643 S.W.2d at 400-01 (a 24-year-old Spanish-speaking female enrolled in special education classes was competent to testify in a murder trial despite the fact that the court's interpreter was used and leading questions were allowed). Instead, it affected her credibility and the weight of her testimony. *See Allen*, 479 S.W.2d at 280.

9

The trial court did not abuse its discretion in determining that complainant was competent to testify. Appellant's first issue is overruled.

## II.    Charge Error

In his second issue, appellant argues that he was egregiously harmed by an error in the jury charge based on the parole eligibility instruction. The State and appellant agree that the trial court should have instructed the jury pursuant to Code of Criminal Procedure Article 37.07, section 4(a), which provides, in relevant part, appellant will not become eligible for parole until the actual time served equals one-half of the sentence imposed or 30 years, whichever is less, without consideration of any good conduct time he may earn. *See* Tex. Code Crim. Proc. Ann. art. 37.07 § 4(a) (Vernon Supp. 2012). Instead, the instruction given by the court erroneously stated that appellant would not become eligible for parole until the actual time served plus any good conduct time earned equaled one-fourth of the sentence imposed or 15 years, whichever is less. Appellant did not object to the erroneous instruction.

Even though the trial court erred in its instruction, we conclude that appellant was not harmed by the alleged error. Because appellant failed to object to the charge, reversal is required only if appellant was egregiously harmed. *Rolle v. State*, 367 S.W.3d 746, 759 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd) (citing *Warner v. State*, 245 S.W.3d 458, 461 (Tex. Crim. App. 2008)). To assess the degree of harm resulting from jury charge error, we consider the factors laid forth in *Almanza*, which include "the entire jury charge, the state of the evidence, including the contested issues and weight of the probative evidence, the arguments of counsel, and any other relevant information revealed by the record of the trial as a whole." *Id.* (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984)). Appellant must have suffered actual, rather than theoretical, harm. *Id.*

10

"Errors that result in egregious harm are those that affect 'the very basis of the case,' 'deprive the defendant of a valuable right,' or 'vitally affect a defensive theory.'" *Id.* (quoting *Almanza*, 686 S.W.2d at 172.).

Although the jury charge erroneously described parole eligibility, a number of factors mitigate against a finding of egregious harm. *See Igo v. State*, 210 S.W.3d 645, 647-48 (Tex. Crim. App. 2006) (erroneous description of parole eligibility did not cause egregious harm even though the maximum sentence was assessed because charge contained curative language; parole law was not mentioned in closing argument; and evidence relating to punishment was exceptionally strong).

First, the parole instruction contained curative language admonishing the jury not to consider the manner in which the parole law would be applied to appellant. *See id*. Second, appellant was sentenced to 30 years' imprisonment; the punishment range for the offense was a minimum of 25 years to a maximum of life. *See id*.; *see also* Tex. Penal Code Ann. § 12.41(d) (Vernon 2011). Third, parole was not mentioned by the prosecution during sentencing and was only mentioned by the defense to explain that the jury is not to consider the manner in which parole law might apply to appellant. *See Igo*, 210 at 647-48. Finally, evidence presented during the punishment phase revealed the violent nature of appellant's two prior felony convictions, theft and aggravated robbery. *See id.*

After considering the above facts, we cannot conclude that the charge error amounted to egregious harm. Appellant's second issue is overruled.

11

## CONCLUSION

Having overruled each of appellant's issues, we affirm the trial court's judgment.

/s/    William J. Boyce
          Justice

Panel consists of Chief Justice Frost and Justices Boyce and Jamison.

Publish—Tex. R. App. P. 47.2(b).