**Affirmed as Modified; Opinion Filed August 8, 2016.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-15-00560-CR

**CLEZEL MONTAGUE MUGHNI, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court No. 3**
**Dallas County, Texas**
**Trial Court Cause No. F-1475905-J**

## MEMORANDUM OPINION

Before Justices Francis, Fillmore, and Schenck
Opinion by Justice Francis

A jury convicted Clezel Montague Mughni of capital murder in the beating death of his roommate's fifteen-month-old son. Because the State did not seek the death penalty, punishment is life in prison without parole. In four issues, appellant complains the trial court erred by (1) finding a child witness competent to testify, (2) abandoning its neutral and impartial role by injecting itself into the State's case, and (3) admitting evidence of unadjudicated extraneous offenses against two other children who lived in the residence. In a fifth issue, appellant asserts the evidence is legally insufficient to support his conviction. For the reasons discussed below, we conclude appellant's issues are without merit. On the State's request, we modify the trial court's judgment to reflect no possibility of parole. We affirm the judgment as modified.

On the morning of June 2, 2014, Dallas Fire Rescue was dispatched on an unresponsive child call to a Dallas apartment complex. When officers arrived, they found fifteen-month-old Marquis Johnson lying on a floor. He was pale and cool to the touch and did not have a heartbeat. Officers began CPR. Officer David Lindsey noticed an obvious injury to Marquis' right eye, an "inordinate amount" of bumps and bruises, and a pattern of "poke" or "prickly" marks to his shoulder. His abdomen was "very, very round" and "larger than normal."

Lindsey asked the adults in the room what was "going on," and the child's mother, Claudia Johnson, said Marquis was so weak he could not hold up his sippy cup. Lindsey asked what had happened before DFR arrived, and appellant said Marquis had fallen the night before and had been weak ever since. As Lindsey asked more questions to get information, appellant would "jump and answer the question" and not let the mother respond, which Lindsey thought was "really suspicious."

Marquis was transported to the hospital, where medical personnel likewise observed bruising to his face and elsewhere on his body as well as "strange marks" on his shoulder. Despite their efforts, they were unable to revive the child. Mother told the emergency room doctor that Marquis had fallen in the bathtub, although she did not see it happen. She also said Marquis had been vomiting for a few days and had a fever.

Dallas police were called to the hospital and met with the medical staff and Marquis's mother. The police learned that Marquis lived in the apartment with his mother; two siblings, four-year-old D'Asia and two-and-a-half-year-old Makayla; appellant; appellant's long-time girlfriend, Sasha Mitchell; and Mitchell's four-year-old son, Isaiah. Police went to the apartment and took the children and the adults to the Dallas Children's Advocacy Center for interviews. Once there, Makayla almost immediately began showing signs of injury. She was lethargic and unable to walk, was moaning, and had soiled her clothing. At first, workers had her lie down,

but when she began to vomit a green substance, they took her to the hospital with what were determined to be life-threatening injuries. Her pediatric surgeon testified that a segment of Makayla's small intestine "was separated" and she had a lacerated liver. He said the injuries most likely happened within the previous twenty-four hours, were caused by force moving from front to back, and could be consistent with an adult male punching her in the abdominal area. Makayla survived her injuries.

An autopsy was performed on Marquis the same day, and the medical examiner determined he died of blunt force trauma. Like Makayla, Marquis' small intestine was "split into two pieces" and he had a lacerated liver. The medical examiner said the injuries were consistent with being punched by an adult male, and the person inflicting the kind of force needed to cause these types of injuries should have known death could result. In addition to these injuries, Marquis also had bruises to his face, abdomen, and extremities. He had "pattern" injuries, "almost dot-like" marks, to his shoulder, head, chest, and back, which the medical examiner said was mostly likely caused by a hair brush. He also had fresh and healed rib fractures and a fractured skull.

According to the medical examiner, the injury to the small intestine was not "survivable" for more than a couple of hours, and the liver injury was at least a few days old. The medical examiner testified the fresh rib facture occurred within twenty-four hours and the healing fractures could have occurred within a week to two weeks.

At trial, one of the children living in the home, Isaiah, who was then five, testified he remembered when he lived with his "daddy," "mommy," Marquis, Makayla, and D'Asia. When asked who punished the children when they got in trouble, Marquis said "all of them." Marquis then testified that when he got in trouble, his daddy "punched" him in the stomach. He said his daddy also "punched the other kids," including Marquis and Makayla. He said Marquis and

Makayla "would cry" because it hurt. He did something called "stand against the wall," where he sat against the wall and put his hands up. If he put his hands down, "daddy" would punch him. He did the same thing to Marquis. Isaiah acknowledged that it had been a long time since he had seen his daddy and said he did not see him in the courtroom.

After the trial court voiced concern that Isaiah had not connected the hitting of Marquis to the time frame of his death, Isaiah was recalled without objection. Isaiah acknowledged testifying earlier and telling the jury "some things." Then, on questioning by the State, Isaiah said he remembered the day the red fire truck came to the apartment and, around that time, Marquis got in trouble and was punched.

Isaiah's mother, Sasha Mitchell, testified she and appellant had been together since Isaiah was four months old, and Isaiah called him "daddy." She, like other witnesses, said appellant had lost a lot of weight and looked different since his arrest. About two months before Marquis' death, Johnson and her three children moved into the apartment she and Isaiah shared with appellant. Appellant told her Johnson needed a place to stay, and Mitchell was unaware they were having a sexual relationship. Mitchell was the only one who had a job. She said she worked six to seven days a week, at least eight hours a day, managing a pizza restaurant. She agreed that "things" had happened in the house that she did not know about because she was not there. She told the jury that on the day of Marquis' death, when the fire truck came, the other children were in another room and remained there the entire time.

Finally, Dallas Police Detective Emilio Henry took appellant's statement on the day Marquis died. In his statement, appellant referred to the children living in the apartment as his "kids" although none was his biological child. He denied ever hitting Marquis with a comb or brush. But, several minutes into the interview, the detective told appellant that the children's interviews were completed, and one of the children reported that appellant punched Marquis in

–4–

the stomach that morning. The detective then asked appellant how many times he punched Marquis, and appellant said "one time." Then, later he said he did not know what caused Marquis to collapse and denied disciplining him in the days before his death. The video recording of appellant's interview was admitted into evidence.

Appellant was charged with capital murder. The indictment alleged appellant intentionally and knowingly caused Marquis' death by striking him with his hand, a brush, or other unknown object, each alleged as a deadly weapon, and Marquis was under ten years of age at the time of the offense. After hearing the evidence, the jury convicted him of the charge.

We begin with appellant's fifth issue in which he argues the evidence is legally insufficient to support his conviction. His argument is premised on our disregarding evidence challenged in his other issues on appeal. Specifically, he asserts that if (1) as requested in his first issue, Isaiah is deemed incompetent to testify, and (2) as requested in the third and fourth issues, we sustain his complaint to Isaiah's testimony that appellant struck the children and the pediatric surgeon's testimony about Makayla's injuries as improper extraneous offense evidence, there will be no evidence that appellant struck Marquis except for his admission that he hit him one time. The law is well-settled that our review of all of the evidence includes evidence that was properly and improperly admitted. *Sorrells v. State*, 343 S.W.3d 152, 155 (Tex. Crim. App. 2011). Consequently, this complaint is without merit.

Alternatively, appellant asserts that "[e]ven with the evidence unlawfully admitted . . ., the evidence is not sufficient to sustain a guilty verdict." He relies on his previous arguments that three adults had access to Marquis on the day of the offense and no physical evidence shows he struck Marquis that day or any other day. He also asserts no physical evidence or DNA evidence shows he used one or more of the brushes seized at the apartment to strike Marquis.

In reviewing a challenge to the sufficiency of the evidence, we examine the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). This standard accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic to ultimate facts. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Therefore, when analyzing the sufficiency of the evidence, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all of the evidence when viewed in the light most favorable to the verdict." *Id*. Direct and circumstantial evidence are treated equally. *Id*.

A person commits the offense of capital murder if he intentionally or knowingly causes the death of a child under ten years of age. TEX. PENAL CODE ANN. § 19.03(a)(8) (West Supp. 2015). It is the obligation and responsibility of the appellate courts "to ensure that the evidence presented actually supports a conclusion that the defendant committed the crime that was charged." *Winfrey v. State*, 323 S.W.3d 875, 882 (Tex. Crim. App. 2010); *Mayo v. State*, 238 S.W.2d 777, 778 (Tex. Crim. App. 1951) (explaining that State has burden of proving beyond a reasonable doubt that accused was person who committed offense charged).

Marquis died of blunt force trauma. While appellant argues these injuries could have been caused by blows from a man or woman or from a fall, the jury heard evidence that it was appellant who punched Marquis in the stomach the day he died. Even appellant was willing to admit he hit Marquis one time. And although five-year-old Isaiah may not have given a sequential account of what happened that day and responded to primarily leading questions, his testimony established that appellant punished the children by hitting them. He testified that as part of the "stand against the wall" method of punishment, appellant made them sit against the wall and put up their hands. If they let their hands drop, appellant punched them. He said

appellant punched him in the stomach as well as Marquis and Makayla. He told the jury that around the time the fire trucks came to the apartment, Marquis got in trouble and appellant punched him in the stomach. The autopsy showed that Marquis's small intestine was split in two, and the medical examiner testified it could be consistent with an adult male punching him in the abdominal area. He also said such an injury was not survivable for more than two hours, and a person using that kind of force should have known that death could result. The injuries, he said, were "not accidental."

Further, the evidence showed that shortly after Marquis died, Makayla was rushed to the hospital with the exact same injury. She survived because she received treatment. Like the medical examiner who performed the autopsy on Marquis's body, Makayla's pediatric surgeon testified the injury could be consistent with an adult male punching her in the abdominal area. Considering all of the evidence, a rational jury could have found beyond a reasonable doubt that appellant was the person who intentionally caused Marquis' death. We overrule the fifth issue.

In his first issue, appellant contends the trial court abused its discretion by finding five-year-old Isaiah competent to testify.

Isaiah was called to the stand and demonstrated he knew his name and his age. When asked the color of the prosecutor's tie, he correctly said red. Isaiah said if the prosecutor told him the tie was yellow, that would be a lie. He then promised to tell the truth. At that point, the trial court asked defense counsel if he had any concerns, and counsel replied, "I don't think he's been fully –[.]" The trial court then questioned Isaiah:

[TRIAL COURT]: How are you doing?

[ISAIAH]: Good.

[TRIAL COURT]: Isaiah, do you know the difference between the truth and a lie?

[ISAIAH]: Uh, no.

[TRIAL COURT]: Say it again?

[ISAIAH]: No.

[TRIAL COURT]: No? Do you know the difference between telling the truth —

[ISAIAH]: Yes.

[TRIAL COURT]: — and telling a lie?

[ISAIAH]: Yes.

[TRIAL COURT]: Yes?

[ISAIAH]: (Nods head).

[TRIAL COURT]: Okay. And you understand that here in court, you have to tell the truth?

[ISAIAH]: Yes.

[TRIAL COURT]: You understand that?

[ISAIAH]: Yes, ma'am.

[TRIAL COURT]: Okay. When you don't tell the truth what happens to you?

[ISAIAH]: You get in trouble.

[TRIAL COURT]: You get in trouble. Okay. So you understand it's important that you tell the truth here, right?

[ISAIAH]: Yes.

The trial court asked if either the State or defense had "[a]nything else" regarding "qualifying this young man," and both said no. Isaiah then testified without any objection by appellant. To preserve an issue for appellate review, an appellant must make a specific objection to the trial court at the time the alleged error arises and must obtain a ruling on the objection. TEX. R. APP. P. 33.1(a). Because appellant did not object to Isaiah's competency to testify, appellant has failed to preserve the issue and may not raise it for the first time on appeal. *See De Los Santos v. State*, 219 S.W.3d 71, 80 (Tex. App.—San Antonio 2006, no pet.).

–8–

Even if the issue had been preserved, appellant has not shown the trial court erred by finding Isaiah competent to testify. The competency of a witness is an issue to be resolved by the trial court, and that decision will not be disturbed on appeal absent an abuse of discretion. *Id.* Texas Rule of Evidence 601 provides as follows:

> **(a) In General.** Every person is competent to be a witness unless these rules provide otherwise. The following witnesses are incompetent:
>
> * * *
>
> **(2) Persons Lacking Sufficient Intellect.** A child—or any other person––whom the court examines and finds lacks sufficient intellect to testify concerning the matters in issue.

TEX. R. EVID. 601.

The considerations in determining a child witness's capacity to narrate involve "both an ability to understand the questions asked and to frame intelligent answers and . . . a moral responsibility to tell the truth." *Torres v. State*, 33 S.W.3d 252, 255 (Tex. Crim. App. 2000) (quoting *Watson v. State*, 596 S.W.2d 867, 870 (Tex. Crim. App. 1980)). There is no certain age below which a child is automatically deemed incompetent to testify. *De Los Santos*, 219 S.W.3d at 80. In evaluating a child witness's competency, the court examines the child's responses to qualification questions as well as the child's entire testimony. *Id.* at 81.

Once the trial court determined Isaiah was competent, Isaiah went on to show that he knew the date of his birth and the name of his school. He said his favorite part of school was playing outside and gave the name of his best friend. During specific questioning by the State, Isaiah testified his father punished the children by punching them in the stomach and testified about a form of punishment called, "stand against the wall." Although he did not recognize appellant in the courtroom as his father, the record showed he had not seen him in a long time and appellant, who weighed over 300 pounds at the time of the incident, had lost a lot of weight.

On cross-examination, he named his favorite television show but could not say what they do on the show. On specific questions from defense counsel, he said he and his father played Mr. America and Incredible Hulk and he played the part of Mr. America but could not fly like Mr. America. He also said they would hit each other while playing and they had fun, indicating that he could distinguish between a playful hit and punishment. When asked if his daddy was good to him, he said no.

Overall, the record shows Isaiah knew the difference between a truth and a lie, understood there were consequences for not telling the truth ("you get in trouble"), and said he understood it was important to tell the truth. He answered questions about his father's pattern of disciplining the children by punching them in the stomach, and his answers indicated he understood the questions asked. He knew the difference between a playful hit and a hit intended to hurt him. Although appellant complains Isaiah did not give "narrative" testimony, the fact that he seemed to respond best to leading questions does not mean he lacked the intelligence or capacity to narrate events. Considering all of Isaiah's responses, we conclude the trial court did not abuse its discretion by finding him competent to testify. We overrule the first issue.

In his second issue, appellant argues the trial court abused its discretion "when it injected itself into State's case and told the prosecutor how to present evidence so that testimony of the child witness would be found by the court to be relevant and admissible." This issue concerns Isaiah's appearance before the jury.

During Isaiah's initial testimony, he said his "daddy" punished him and the other children, including Marquis and Makayla, by punching them in the stomach. The prosecutor also asked if the children "have to do something called 'stand against the wall?'" Isaiah said "yes." As the prosecutor demonstrated a seated position against a wall, Isaiah said he had to put his

hands up and, if he lowered them, his "dad" would punch him. Isaiah said he did the same to Marquis.

Later that day, after Isaiah had been excused subject to recall, the trial judge voiced concern to the State about the purpose of Isaiah's testimony and specifically that it was not connected to "this particular offense." The trial judge said it was her understanding "from our conversation" that Isaiah was a witness to what happened to Marquis, "and that is clearly not what you put on the record before." Without a temporal link, the judge said the testimony was nothing more than a "list of extraneous offenses" and warned "we may be looking at that testimony either being stricken from the record or a possible mistrial." The judge told the State if it could "connect this child's testimony to the particular offense that we're here on or in some way give me some idea of how close it is to it, then I can make a better determination whether it is relevant or not."

The State took the position that the evidence, even without a temporal link, was admissible "under 404(b) to "show an absence of mistake, the same M.O., the same plan" but said it would move forward "as the Court had instructed." After further discussion on the issue, the following colloquy occurred:

> [TRIAL COURT]: And, [Defense Counsel], you can put on the record whatever you need to put on.
>
> [DEFENSE COUNSEL]: I won't put anything on the record at this time.
>
> [TRIAL COURT]: I'm pretty sure I know what the objection would be if you would put it on, but okay.
>
> All right. Go ahead and get the jury.
>
> You think I'm helping the State.
>
> [DEFENSE COUNSEL]: I didn't say a word.

The State then recalled Isaiah to testify about the timing of the events he had earlier described. Isaiah said he remembered when the red fire trucks came to his apartment, and said

Marquis got "in trouble" and was punched around that time. Defense counsel lodged no objection.

Appellant argues the trial court abandoned its position as a neutral and impartial arbiter and took on the role as advocate by "giving advice" to the prosecutor on how to get certain evidence admitted. He asserts the trial court's actions were to "the detriment" of his rights to a fair trial.

Most appellate complaints must be preserved by a timely request for relief at the trial court level. *See* TEX. R. APP. P. 33.1; *Unkart v. State,* 400 S.W.3d 94, 98 (Tex. Crim. App. 2013); *Marin v. State,* 851 S.W.2d 275, 278 (Tex. Crim. App. 1993), *overruled on other grounds by Cain v. State,* 947 S.W.2d 262, 264 (Tex. Crim. App. 1997). Even claims involving constitutional error, including claims that due process rights have been violated, must be preserved by objection or are waived. *Hull v. State,* 67 S.W.2d 215, 218 (Tex. Crim. App. 2002); *Briggs v. State,* 789 S.W.2d 918, 924 (Tex. Crim. App. 1990). More specifically, where no objection is made, remarks and conduct of the court may not be subsequently challenged unless they rise to the level of fundamental error. *Brewer v. State*, 572 S.W.2d 719, 721 (Tex. Crim. App. [Panel Op.] 1978).

The Texas Court of Criminal Appeals has granted relief on an improper judicial comment complaint that was not preserved at trial. *See Blue v. State,* 41 S.W.3d 129 (Tex. Crim. App. 2000) (plurality op.). There, the trial judge apologized to the jurors about the delay in the case, telling them the defendant was still deciding whether to accept the State's offer or go to trial. The trial judge told the jurors he would "prefer the defendant to plead" because it would give him "more time to get things done." *Id.* at 130. A plurality of the Court decided the judge's remarks vitiated the defendant's presumption of innocence and were fundamental error of constitutional dimension that required no objection. *Id.* at 131–32. Since *Blue,* the Court has explained it is

without "precedential value" as a plurality opinion and may only be considered for any persuasive value it may have. *Unkart*, 400 S.W.3d at 101. The complained-of conduct in this case, however, did not implicate appellant's "presumption of innocence," so any "persuasive value" *Blue* could have is simply not present.

Here, appellant did not object even when given the opportunity by the trial court. Because the record does not demonstrate the unique circumstances that would allow us to review the issue in the absence of objection, we conclude appellant has failed to preserve this complaint for our review. We overrule second issue.

In his third and fourth issues, appellant argues the trial court erred by admitting evidence of unadjudicated extraneous offenses of injury to a child, involving Isaiah and Makayla. His third issue challenges Isaiah's testimony that his father punched him; he does not challenge Isaiah's testimony that appellant punched Marquis on the day Marquis died. His fourth issue challenges the admission of evidence that Marquis' sister, Makayla, was taken to the hospital the same day with abdominal injuries.

The issue of extraneous offense evidence came up in a pretrial hearing when the State told the court that one of its witnesses, Johnson's oldest child, D'Asia, had become unavailable due to her Asperger's syndrome. The prosecutor then indicated it would offer evidence of Makayla's injuries, which he believed was admissible because she suffered the same injuries as Marquis. The trial court asked if the parties wanted a hearing outside the presence of the jury, and defense counsel said he would "wait to hear it as it comes in; and if I deem it necessary to have a hearing outside the presence of the jury, I will approach."

On the first day of trial, after the jury was selected, the State confirmed its intent to put on evidence of injuries to Isaiah and Makayla as same transaction contextual evidence. The trial court asked defense counsel his position, and he responded, "At this present moment in time, I'm

gonna object. I don't know how they – I mean, I will agree that they're closely related, but I think they can be separated. Now, as the testimony rolls out, my opinion might change, but at this moment in time –[.]" The State went on to explain Isaiah would testify to abuse that happened to him and all the children and said the story "is kind of all intertwined." As the State explained, on the same day Marquis died, Makayla was rushed to the hospital with the same injuries. The trial court instructed the State to approach the bench before bringing the matter up and said it would then rule.

The next day, before testimony began in the State's case-in-chief, the trial court ruled that Isaiah would be allowed to testify to the extraneous offenses, based on the State's representations that the facts were intertwined and the child would be testifying, not just about what he observed, but also about "things that happened to him." Further, the court stated it understood appellant was "objecting to it" and said it would allow him to "make any objections that you feel are outside of the scope of what I'm ruling on right now." Appellant asked for a "running objection" and said he would make additional objections if needed. He made no other objections before, during, or after Isaiah's testimony.

In his brief, appellant sets out the law regarding extraneous offenses and same transaction contextual evidence. He does not, however, argue or apply this law to the facts in this case. Instead, his analysis is solely devoted to whether the evidence was inadmissible under Texas Rule of Evidence 403.

An objection that proffered evidence amounts to proof of an extraneous offense does not suffice, by itself, to invoke a ruling from the trial court as to whether the evidence, assuming it has relevance apart from character conformity, is nevertheless subject to exclusion on the ground of unfair prejudice. *Montgomery v. State*, 810 S.W.2d 372, 388 (Tex. Crim. App. 1991) (op. on reh'g). An objection based upon rule 403 is required. *Id*.

Although appellant objected only generally to Isaiah's testimony, the context of the above discussions suggests he was objecting to extraneous offense evidence. The record does not indicate, however, that he made any objection under rule 403, the only basis argued in his brief. Consequently, this complaint is waived. To the extent appellant complains the trial court abused its discretion by allowing the surgeon to testify regarding Makayla's injuries or the CPS worker to testify regarding Makayla's condition at the Advocacy Center, he did not object, and nothing in the record suggests the trial court's granting of a running objection to Isaiah's testimony was extended to these two witnesses. Even if the running objection extended to these witnesses, appellant has briefed only a rule 403 complaint. Accordingly this complaint is likewise waived. We overrule issues three and four.

Finally, the State asserts the judgment should be modified to reflect the sentence as life without parole. A person convicted of a capital felony in a case where the State does not seek the death penalty shall be imprisoned in TDCJ for life without parole if the person who committed the offense is eighteen years of age or older. TEX. PENAL CODE ANN. § 12.31(a)(2) (West Supp. 2015). The record shows appellant was twenty-seven years old on the date of the offense.

We have authority to correct a judgment below to make the record "speak the truth" when we have the necessary data and information to do so. *Asberry v. State*, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet. ref'd). Accordingly, we modify the trial court's judgment to reflect a sentence of life without parole.

We affirm the judgment as modified.

/Molly Francis/
MOLLY FRANCIS
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)
150560F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

CLEZEL MONTAGUE MUGHNI,
Appellant

No. 05-15-00560-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court
No. 3, Dallas County, Texas
Trial Court Cause No. F-1475905-J.
Opinion delivered by Justice Francis;
Justices Fillmore and Schenck participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

To reflect punishment as life without parole.

As **MODIFIED**, the judgment is **AFFIRMED**.

Judgment entered this 8th day of August, 2016.