**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-21-00203-CR**

_____

**RAUL LONGORIA, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 435th District Court**
**Montgomery County, Texas**
**Trial Cause No. 19-05-06404-CR**

**MEMORANDUM OPINION**

In a single appellate issue, Appellant challenges his conviction for aggravated sexual assault of a disabled individual. Tex. Penal Code Ann. § 22.021. Specifically, he contends that the "trial court erred by failing to provide a jury charge related to the issue of consent as it relates to Aggravated Sexual Assault of a Disabled Person[.]" We affirm.

# I. Background

Appellant and Rachel were in a dating relationship and Appellant was staying in a garage apartment on Rachel's property. Rachel's thirty-one-year-old disabled daughter, Angie[1], lived with Rachel in Rachel's home on Rachel's property. According to State's Exhibit 9, which was admitted into evidence without objection, Angie is subject to a permanent guardianship because she is "incapacitated because of a mental condition and [she][] is totally without capacity as provided by the Texas Probate Code to care for herself, to manage her property and financial affairs, to operate a motor vehicle and to vote in a public election." Rachel is Angie's permanent guardian. On May 7, 2019, Angie called 911 from a gas station and alleged that Longoria (her Mother's boyfriend) had sexually assaulted her. Longoria was indicted for aggravated sexual assault of a disabled person, with two enhancement paragraphs (a prior felony for DWI and a prior felony of attempted murder). Tex. Penal Code 22.021 (a)(2)(c). The jury found Appellant guilty of the offense as alleged in the indictment, the trial court sentenced Appellant to eighty years in the Institutional Division of the Texas Department of Criminal Justice, and

---

[1] We refer to the victim and her family by pseudonyms to conceal their identities. *See* Tex. Const. art. I, § 30(a)(1) (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

2

Appellant timely filed a notice of appeal. We summarize the testimony and evidence below.

## 1. Karen Bailey's Testimony

Bailey was one of the paramedics who responded to Angie Stewart's 911 call. She outlined her training and experience in her position, noting that records of patient interactions are made at or near the time of the events reflected in those records. Bailey described Angie as not only barefoot and very upset when the paramedics first encountered her, but as wet from the rain. She further recalled that Angie seemed to be "socially challenged[,]" in that although Angie was able to answer basic questions, she did not seem to understand some of the things that were happening.

During the drive to the hospital, Bailey made notes of Angie's description of the assault. The notes were admitted into evidence as part of State's Exhibit 10. According to the notes, EMS arrived on the scene and found Angie inside the gas station, and they escorted Angie to the ambulance. Angie was "crying and upset and wet from heavy rain." According to the EMS notes, Angie told them "her Mom's boyfriend attacked her…that he came to the house smelling like alcohol and appeared drunk…that he came in and started trying to kiss her and pulled her by the hair…she tried to stop him but was unable…he ended up taking her shirt off and sucking on her breasts…he forced her back to the bedroom [and] she was able to get

3

her taser and use it on him twice before he took it from her…then he used it on the right side of her head, her right arm, and multiple times on her breasts…he sucked on her private areas…and inserted his fingers in her vagina… . [She] ran from the house once she was able and went to the gas station to call 911."

Bailey's notes further indicate that Angie was in pain but declined the offer of pain medication.

## 2. Deputy Brown's Testimony

Montgomery County Deputy Sheriff Joneataa Brown testified that she was dispatched to Memorial Hermann Hospital to interview Angie regarding Angie's report of having been sexually assaulted. Her impression was that Angie was not only distraught and frightened, but she also had the impression about her being mentally delayed, that her demeanor and her speaking was "very childlike."

While working with Angie and her mother, Brown obtained permission to search their home for evidence, and she relayed information to the officers who went to Rachel's house to gather evidence. Deputy Brown also photographed Angie, and State's Exhibits 42-51 are photographs Brown took of Angie at the hospital. The photographs of her showed scratches and bruises but Deputy Brown agreed the photos do not show serious injuries. On cross-examination Deputy Brown agreed that she did not see any "defensive wounds" on Angie, however that "just depends on the person" and "[e]very situation is different depending on the type of trauma."

4

### 3. Deputy Heaton's Testimony

Deputy Sam Heaton, of the Montgomery County Sheriff's Office, testified that on the day of Angie Stewart's assault, he and other deputies searched Angie and her mother's residence, and gathered evidence from that location. He recalled that they found a "Taser"[2] on the bed, and a brass candlestick on the floor beside the bed. Elsewhere in the home, they located and photographed what later was shown to be Angie's shirt and brassiere, her broken glasses, and a variety of other household items.

### 4. Detective Frisina's Testimony

Detective Anthony Frisina testified, describing his training and his law enforcement experience during his eight years with the Montgomery County Sheriff's Office. On the day after Angie reported her assault, Frisina interviewed Appellant at the jail. He described his approach to conducting a custodial interview, noting that he begins by reading *Miranda* warnings,[3] and ensuring that the suspect expresses his understanding of his rights. He also recorded the interview. It is also his standard procedure to attempt to build a rapport with the suspect in the hope of obtaining truthful information about relevant events. Generally, he uses a technique when conducting the interview that allows the suspect "to minimize" what happened

---

[2] Although many of the trial participants referred to this object as a Taser, other evidence shows that it was a Night Watchman brand stun gun.

[3] *Miranda v. Arizona*, 384 U.S.436, 1966.

and give them a way to tell what happened without in a way that wouldn't portray them in as bad of a light had they been fully forthcoming initially."

Longoria did not testify at trial. However, his recorded interview was played for the jury at trial. Describing the interview, Detective Frisina explained that in the interview, after expressing an understanding of his rights, Longoria described Angie as having adult like and childlike behaviors, that she still watched cartoons, and that she had both an adult and a child-like voice. Appellant confirmed that he lived on the same property as Rachel and Angie, and that he and Rachel shared a biological child. Although Appellant and Rachel were no longer a couple, he continued to reside at the property where he provided handyman services and fed the resident animals. He explained that on the date of Angie's alleged assault, he went from his apartment to the house to have coffee and feed the animals; he acknowledged that he was drinking that day. While he was there, he accidentally brushed against Angie's breasts while the two of them were sitting on the sofa watching television and playing with the dog, and he admitted to flirtatiously touching her buttocks through her clothing. He further acknowledged that the two of them watched pornography on his phone. Longoria contended that Angie enjoyed doing so. Appellant also stated that Angie voluntarily showed him her breasts, but denied that he had violated her, although she apparently "took it that way." When confronted with the possibility that Angie's SANE examination might have detected

Appellant's saliva on Angie's breasts or vagina, Appellant blamed the dog and Angie's hygiene. He characterized their contact as consensual but indicated that he would apologize to Angie if given the opportunity to do so.

Appellant denied seeking revenge against Rachel, although he admitted that their relationship had become rocky in recent years. He expressed his awareness of Angie's disability, and after repeatedly denying that he had done anything wrong, he conceded that he probably committed a crime against Angie.

According to Frisina, Longoria admitted during the interview that he touched Angie's breasts and vagina. Detective Frisina asked Longoria about the taser recovered from the house, and Longoria said that he and Angie were both playing with the "taser" and taking turns tasing each other and the dog. State's Exhibit 53, the recorded interview was admitted into evidence and played for the jury.

Frisina testified that in light of his training and experience he did not believe that Appellant was being truthful.

Q. In light of your training and experience, are there some things about the defendant's interview that to you indicate he's not being truthful?

A. Yes, sir.

Q. What are some of those things?

A. One of them, in particular, that stands out is editing out time and space, skipping events or skipping a block of time, editing adverbs, things of that nature.

7

Q. What does that mean when you say editing out time? What does that mean? Explain that to the jury, if you don't mind.

A. One of the first things Raul said during our interview was he came over for coffee, and then that was it, as if that's all that happened that day, indicating that someone may or may not be trying to avoid talking about a particular event that happened that day that they don't want to talk about.

Q. So for example, him saying he came for coffee, that's one little snip of an event, and did the defendant give you any additional story after that?

A. During that initial few minutes? No. We had to go back over it.

Q. So, for things like that where the defendant is not telling a full story, did you have to go back and elicit more information from him?

A. Yes, sir.

Q. Is that a sign of deception based on your training and experience?

A. Yes, sir.

Q. Were there any other things that stood out in his interview and the information he was giving that made you feel like he was being deceptive?

A. The fact that I -- we continued -- we had to keep going over the story, and occasionally, a piece that we had just previously talked about would change.

For example, when Raul said he was touching Amber's vagina, and then he said he wasn't. Then, he said he was through the clothes. That's a clear-cut -- at least to me based off my experience, a clear-cut indicator of deception. Not conclusive, of course, but an indicator.

Q. So, his s[t]or[]y changing and not keeping his statements straight throughout the interview?

8

A. Yes, sir.

Detective Frisina also testified that State's Exhibit 2 is the actual taser they found at the house, and that it is depicted in State's Exhibit 39, a photo taken of evidence gathered at the house during their investigation. He demonstrated to the jury how the taser worked and that when charged it still functioned.

Detective Frisina obtained a search warrant to collect a DNA sample from Longoria and the warrant was admitted into evidence as State's Exhibit 55. He collected two swabs from the inside of Longoria's mouth, placed them into envelopes, initialed the envelope, and sent it to the lab for analysis. The envelope is depicted on the photograph admitted into evidence as State's Exhibit 1. According to the Detective during his interview, Longoria described Angie as being "special needs", and as having "the personality of an eight-year-old."

## 5. Yvy Llambes' Testimony

Llambes, a sexual assault nurse examiner ("SANE"), testified as to her educational and professional qualifications and certifications. She said the purpose of a SANE examination is to provide medical treatment for the patient and gather evidence.

Llambes outlined the procedure for conducting a SANE examination, both generally and with specific reference to the SANE examination she performed on Angie shortly following the alleged assault. She confirmed the history of the assault

that Angie gave at the time of the examination and noted that Angie seemed "childlike" in her communication style. Llambes further recalled that Angie "was a detailed historian[,]" and was tearful during the examination, repeatedly stating "I'm not going back there. I'm never going back." Llambes testified that Angie told her during the exam that Longoria came into the house, took scissors away from her, forcefully took off her bra and shirt, took away the "taser" that she had tased him with, and tased her with it while she was "fighting with him." She bit him. Angie then told Llambes that Longoria wrestled her onto her bed in her bedroom and forcefully took off her pants and panties. She said Longoria then sucked on her breast, forced her legs apart, and licked on her vagina. She told Llambes that Longoria then forced his finger into her vagina, forced his penis into her mouth, and repeatedly asked her if she "liked it." Angie reported to Llambes that she told him "no" and asked why he was doing this to her to which he responded that he was "getting revenge" on her Mom. Longoria then showed her "porn" on his phone and told her he was going to do to her what those people were doing on the phone. Longoria then left the house to re-charge his phone and that is when Angie ran to a nearby gas station and called "911."

Angie declined an internal vaginal examination. Llambes used cotton swabs to attempt to collect evidence. Llambes swabbed Angie's mouth, hands, vaginal area, anal area, pubic hair and breasts and sealed those swabs. Llambes identified

10

photos showing redness on Angie's knees. Llambes also reported that Angie had a bruise on her back.

## 6. Jessica Lake's Testimony

At the time of this case, Lake was a forensic scientist employed at the Texas Department of Public Safety Crime Laboratory in Houston. She described her educational and professional qualifications, as well as the accreditation of the laboratory.

She outlined the process of DNA testing, noting that samples are identified with a unique case number and a bar code to track the movement of evidence within the laboratory and maintain the integrity of its chain of custody. Lake authenticated the chain of custody of the relevant items of evidence and stated that she prepared samples to test for the presence of blood, semen, and other potential sources of DNA. She stated that the laboratory findings were negative for semen but did reveal blood on Angie's underwear.

## 7. Andrew McWhorter's Testimony

McWhorter, like Lake, was a forensic scientist at the Texas Department of Public Safety Crime Laboratory in Houston. He described his training, and explained his duties at the laboratory, indicating that his responsibilities included performing tests to reveal DNA profiles, writing reports of his findings, and testifying in court as to those findings. He echoed Lake's description of the evidence identification

11

method, and described the steps involved in DNA analysis. He explained how to calculate the probability that a DNA sample belongs to a particular person. He opined that the DNA found on Angie's left breast was almost certainly Appellant's, as were DNA samples obtained from Angie's underpants. The witness was unable to state that Appellant's DNA came from skin cells or saliva, but did voice his opinion that it did not come from Appellant's semen.

## 8. Jessica Ehmann's Testimony

Ehman, a supervisor in the DNA section of the Houston Crime Laboratory, described her credentials in the field of forensic science. In the instant case, Ehman performed a technical review of McWhorter's work to assure its accuracy. Upon completion of her review, Ehman was satisfied with McWhorter's report

## 9. Angie's Testimony

Angie described her favorite pastimes, stating that she enjoys drawing, reading, writing stories, playing video games, and attending horse shows with her horse. She described a normal day as beginning with making coffee for herself and her mother, and including hobbies and household chores. She identified the photographs of the house where the assault occurred, recalling that Appellant formerly lived in the garage apartment.

The witness described the day of the assault, and the assault itself, in great detail. She began the day by cleaning the kitchen while her mother was out.

Appellant came to the house and told her that her mother had requested him to babysit; Angie considered that statement odd, because Appellant had not previously babysat Angie, and she knew that her mother would not have made such a request. Appellant then approached Angie, giving her a feeling of dread; she attempted to defend herself with a pair of scissors, but Appellant took them from her and then "ripped" off her shirt and her brassiere. Angie did her best to defend herself, but Appellant forced her into her bedroom and onto her bed, where he then removed the rest of her clothing, held her down, performed oral sex on her, penetrated her vagina with his fingers, and forced his penis into her mouth. Angie made it clear that she did not consent to this encounter with Appellant, and that she did everything in her power to repel the assault by using her stun gun and by striking him with a brass candlestick. She also asked him why he was doing this to her, and he replied that it was his revenge on her mother.

Following the assault, Appellant and Angie got dressed, and Appellant then showed Angie pornographic images on his cell phone, and told her that he was going to do the same things to her that were shown in the video. When Appellant left the house to charge his phone battery, Angie took immediate advantage of his absence by running barefoot through a thunderstorm, to a nearby convenience store, where the clerk allowed her to call 911 for assistance.

The content of Angie's 911 call and her statement to Llambes were both admitted into evidence without objection. The 911 call was played for the jury. In the call, and in her statement, Angie gives details about the assault and the descriptions are consistent with her trial testimony regarding the assault.

## 10. Rachel's Testimony

Rachel testified that she met Longoria in approximately 1990, and that he is the father of her other adult daughter, Betsy. During the time frame relevant to this case, Longoria was living in a separate building on her property, where he had everything he needed; it was not necessary for him to enter the house she and Angie shared. Despite their long-standing relationship, Rachel recently had decided that the living situation could not continue indefinitely, and she had notified Appellant he needed to leave and she gave him a written notice.

In describing Angie, Rachel noted that although her daughter made excellent grades in school, she always attended special education classes. Not only was Angie a sickly baby, diagnosed with failure to thrive, she later was diagnosed as schizophrenic, and when she was a child she reported seeing or hearing "fairies." Due to Angie's mental health issues, Rachel pursued a guardianship proceeding, and Rachel remains Angie's legal guardian; Angie is unable to drive, vote, handle her own money, or make significant medical decisions. Rachel clarified, however, that Angie is able to tell someone if she needs an aspirin. Rachel described Angie as

childlike and recalled that Angie still liked to read children's books and romance novels.

On the day of the alleged assault, Rachel returned home after running errands to find a pair of scissors on the floor, Angie's brassiere on the floor, and Angie's glasses broken. In Rachel's words, "[t]he house was totally wrecked." Sensing that Angie might be in danger, Rachel called the police. She next saw Angie in the hospital; Angie was disheveled, bruised, and was refusing to return to their home.

## II. Sole Issue on Appeal

In his sole issue on appeal, the appellant argues that "the trial court erred by failing to provide a jury charge related to the issue of consent as it relates to Aggravated Sexual Assault of a Disabled Person," and that this failure egregiously harmed the appellant.

## III. Standard of Review

The trial court is required to provide the jury with a written charge setting forth the law applicable to the case prior to the presentation of closing statements. Tex. Code Crim. Proc. Ann. art. 36.14. If there is error in the court's charge "the judgment shall not be reversed unless the error appearing from the record was calculated to injure the rights of defendant, or unless it appears from the record that the defendant has not had a fair and impartial trial." *Id*. art. 36.19. *Almanza v. State*

sets out the standard of review for jury charge error. 686 S.W.2d 157, 171 (Tex. Crim. App. 1985).

We review a claim of charge error through a two-step process: first, determining whether error exists; and second, conducting a harm analysis if error is found to exist. *Rogers v. State*, No. PD-0242-19, 2022 Tex. Crim. App. LEXIS 742, at *7 (Tex. Crim. App. Oct. 26, 2022) (citing *Phillips v. State*, 463 S.W.3d 59, 64-65 (Tex. Crim. App. 2015)); *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005)). Initially we must determine whether error occurred. *See Ngo*, 175 S.W.3d at 743. We defer to the trial court's ruling on questions of fact and questions that turn on credibility and demeanor, and application-of-law-to-fact questions that do not turn on credibility and demeanor are reviewed under a de novo standard. *See Sandoval*, 2022 Tex. Crim. App. LEXIS 844, at *22. If we find error, then we analyze the error for harm. *See id.* When, as here, the defendant did not object at trial and failed to preserve error for appeal, we will not reverse for jury-charge error unless the record shows "egregious harm" to the defendant. *See Ngo*, 175 S.W.3d at 743-44; *Bluitt v. State*, 137 S.W.3d 51, 53 (Tex. Crim. App. 2004); *Almanza*, 686 S.W.2d at 171. In determining whether charge error is egregious we consider: (1) the entirety of the jury charge; (2) the state of the evidence; (3) counsel's arguments; and (4) any other relevant information contained

in the entire trial record. *See Marshall*, 479 S.W.3d at 843; *Taylor*, 332 S.W.3d at 489; *Almanza,* 686 S.W.2d at 171.

## IV. Analysis

The purpose of the jury charge is to instruct the jurors on all of the law that applies to the case. Tex. Code Crim. Proc. Ann. art. 36.14; *See Vasquez v. State*, 389 S.W.3d 361, 366 (Tex. Crim. App. 2012). The trial court included in its charge the following definition of "without the consent of the other person" as applied to the offense of sexual assault:

> A sexual assault . . . is without the consent of the other person if [] the actor compels the other person to submit or participate by the use of physical force, violence, or coercion.

> A sexual assault . . . is without the consent of the other person if [] the actor compels the other person to submit or participate by threatening to use force or violence against the other person or to cause harm to the other person, and the other person believes that the actor has the present ability to execute the threat.

> A sexual assault . . . is without the consent of the other person if [] the actor knows that as a result of mental disease or defect the other person is at the time of the sexual assault incapable either of appraising the nature of the act or resisting it.

Tex. Penal Code Ann. § 22.011(b)(1), (2), (4).

The above definitions were contained within the abstract portion of the jury charge, yet Appellant complains that "the abstract portion of the jury charge did not specifically enumerate" the circumstances "in which a sexual assault is committed

17

without the consent of another person." We construe Appellant's argument to be a complaint about the trial court's failure to include all eleven of the enumerated circumstances contained within the applicable statute. That said, Appellant does not point to any evidence in the record that pertains to the omitted examples contained in the statue, nor does he explain how he was harmed by the failure of the trial court to include the omitted ways the state could have sought to prove a lack of consent which dealt with circumstances not applicable to this case. *See Vasquez*, 389 S.W.3d at 366.

The Appellant's complaint on appeal is that the trial court erred by failing to include in its charge all eleven of the statutory definitions of lack of consent. We cannot say the trial court erred in its submission. The trial record lacked evidence to support the omitted statutory definitions of lack of consent. [4]Among other things, the omitted definitions address such things as a use of surreptitious drugs, the actor's status as a public servant, or a member of the clergy. *See* Tex. Penal Code Ann. § 22.011(b)(6), (8), (10). These circumstances were not raised by the evidence, and Appellant has not argued otherwise; the trial court therefore correctly excluded these definitions from its charge.

---

[4] At the time of the offense alleged, the Texas Penal Code contained eleven definitions of lack of consent; our legislature has since added three more definitions, for a current total of fourteen. *See* Tex. Penal Code Ann. 22.011(b).

18

For the reasons set forth above, we do not find that the jury charge contained error. That said, even if the jury charge were erroneous, Appellant did not object to any error at the trial court; he therefore will not be entitled to a reversal under the rationale of *Almanza* unless egregious harm is shown. *See Almanza*, 686 S.W.2d at 171-72. Egregious harm is defined as harm that deprives the accused of a fair and impartial trial by affecting the very basis of the case, depriving the defendant of a valuable right, or vitally affecting a defensive theory. *See Id.; Hogan v. State*, 440 S.W.3d 211, 217-18 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd). We analyze allegedly egregious harm by evaluating the following:

1. The charge, itself;

2. The state of the evidence, including contested issues and the weight of the probative evidence;

3. Arguments of counsel; and

4. Any other relevant information revealed by the record of the trial as a whole.

*See Screws v. State,* 630 S.W.3d 158, 166 (Tex. App.—Eastland 2020, no pet.) (citation omitted).

Turning first to the charge itself, the charge included statutory definitions of applicable terminology (including the definition of a disabled individual) as well as clear and accurate instructions covering relevant considerations from the presumption of innocence to the application paragraphs. It was tailored to the

19

specific facts of the case, as required. *See Burnett v. State*, 541 S.W.3d 77, 84 (Tex. Crim. App. 2017) (stating that the charge must correspond to the facts of the case).

Next, as to the evidence submitted to the jury, including contested issues and the weight of the probative evidence, there was overwhelming evidence that supported Longoria's conviction of the crime charged. Angie's testimony, along with the testimony from her mother, Rachel, established the elements of the alleged sexual assault, and that Angie was a disabled individual who did not consent to the sexual contact in question. Not only did Angie testify as to her lack of consent, stating that Appellant held her down and placed her in fear of her life, but her mother testified as to Angie's disability, noting that Angie was unable to manage her own affairs and remained under a guardianship, thus indicating that Angie could not consent to sexual activity. In fact, Appellant, himself, recognized Angie's disability, noting that she sometimes exhibited the maturity of an eight-year-old child. The jury could have reasonably concluded that Angie did not consent or that Angie lacked the capacity to consent to sexual activity. *See Hopkins v. State*, 615 S.W.3d 530, 543 (Tex. App.—Houston [1st Dist.] 2020, pet ref'd) (holding that a victim's actual consent is immaterial if the victim lacks the capacity to consent). Appellant's argument that Angie was not disabled because she could complete special education classes, follow simple directions, make coffee, and decline pain medication does not mean that Angie consented to the assault, or that she was not disabled. Similarly, it

does not mean she could "appraise the nature of the sexual act." *Id*. at 539-41; Tex. Penal Code Ann. § 22.011(b)(4).

As for counsel's closing arguments about Angie's credibility, both attorneys made arguments about the credibility of Angie, and about the other evidence presented to the jury. The jury was the sole judge of the credibility of the witnesses and permitted to believe or disbelieve all, none, or some of the testimony presented to it. *See Edward v. State*, 635 S.W.3d 649, 655-56 (Tex. Crim. App. 2021).

After analyzing the evidence under the *Almanza* factors, we conclude that the case for conviction was not made "clearly and significantly" more persuasive by the failure to include an instruction or definition with all eleven enumerated sections described in Tex. Penal Code Ann. 22.011(b). We cannot say that the omitted subsections went to the very basis of the case, or that it deprived the defendant of a valuable right, or that it vitally affected a defensive theory. We conclude that Longoria did not suffer "egregious harm" due to the complained-of omission. *See id*.; *Graves*, 310 S.W.3d at 930. And, we cannot say that the omission in the charge had a substantial or injurious effect on the jury's verdict. *See Proenza*, 541 S.W.3d at 801.

We overrule Appellant's sole issue on appeal, and we affirm the trial court's judgment.

AFFIRMED.

_____
JAY WRIGHT
Justice

Submitted on September 20, 2022
Opinion Delivered April 26, 2023
Do Not Publish

Before Golemon, C.J., Johnson and Wright, JJ.